Stalexport and Huta CZESTOCHOWA; Rautaruukki Oy; Metalexportimport S.A.; Fabrique de Fer de Charleroi, S.A.; U.S. Steel Group, a Unit of USX Corporation, Bethlehem Steel Corporation, Geneva Steel, Gulf States Steel, Inc. of Alabama, Inland Steel Industries, Inc., Lukens Steel Company and Sharon Steel Corporation; AG Der Dillinger Huttenwerke, Plaintiffs,

S.A. Forges de Clabecq, Plaintiff–Intervenor,

v.

UNITED STATES, Defendant,

U.S. Steel Group, a Unit of USX Corporation, Bethlehem Steel Corporation, Geneva Steel, Gulf States Steel, Inc. of Alabama, Inland Steel Industries, Inc., Lukens Steel Company and Sharon Steel Corporation; Usinor Sacilor, Sollac and GTS; Pohang Iron & Steel Co., Ltd.; Fabrique de Fer de Charleroi, S.A.; AG Der Dillinger Huttenwerke; ILVA, S.P.A. and Ilva USA, Inc., Defendant–Intervenors.

Slip Op. 95–96.
Court No. 93–09–00553–INJ.

United States Court of International Trade.

May 23, 1995.

Herzfeld & Rubin, P.C., New York City (Theodore Ness and Christian Hammerl), for plaintiffs, Stalexport and Huta Czestochowa.

Popham, Haik, Schnobrich & Kaufmann, Ltd., Washington, DC, for plaintiff Rautaruukki Oy.

Ackerson & Bishop Chartered, Washington, DC (Frederick P. Waite, Stewart A. Block and M. Roy Goldberg) prior representation, for plaintiff Rautaruukki Oy.

deKieffer Dibble & Horgan, Washington, DC (J. Kevin Horgan), for plaintiff Metalexportimport S.A.

LeBoeuf, Lamb, Greene & MacRae, Washington, DC, (Melvin S. Schwechter), for plaintiff-intervenor S.A. Forges de Clabecq.

Barnes, Richardson & Colburn, Washington, DC (Gunter von Conrad, Peter A. Martin and Mark T. Wasden), for plaintiff/defendant-intervenor Fabrique de Fer de Charleroi, S.A.

Dewey Ballantine, Washington, DC (Alan Wm. Wolff and Michael H. Stein) and Skadden, Arps, Slate, Meagher & Flom, Washington, DC (Robert E. Lighthizer, John J. Mangan, Stephen J. Narkin and M.J. Mace), for plaintiffs/defendant-intervenors, U.S. Steel Group, a Unit of USX Corp., Geneva Steel, Gulf States Steel, Inc. of Ala., Sharon Steel Corp., Bethlehem Steel Corp., Inland Steel Industries, Inc. and Lukens Steel Co.

LeBoeuf, Lamb, Greene & MacRae, Washington, DC (Pierre F. de Ravel d'Esclapon and Mary Patricia Michel), for plaintiff/defendant-intervenor AG der Dillinger Huttenwerke.

Lyn M. Schlitt, Gen. Counsel, U.S. Intern. Trade Com'n, James A. Toupin, Deputy Gen. Counsel, Office of the General Counsel (James M. Lyons, Scott D. Anderson, Cynthia P. Johnson and Kathryn A. Gilchrist), Washington, DC, for defendant.

Weil, Gotshal & Manges, Washington, DC (Jeffrey P. Bialos, Angela J. Paolini Ellard, Martin S. Applebaum and A. Paul Victor), for defendant-intervenor Usinor Sacilor, Sollac and GTS.

Morrison & Foerster, Washington, DC (Donald B. Cameron, G. Brian Busey, Craig A. Lewis and M. Diana Helweg), for defendant-intervenor Pohang Iron & Steel Co., Ltd.

Rogers & Wells, Washington, DC (William Silverman and Ryan Trainer), for defendant-intervenor ILVA, S.p.A. and ILVA USA, Inc.

## OPINION

TSOUCALAS, Judge:

This action is before the Court on plaintiffs' motions for judgment on the administrative record pursuant to Rule 56.2 of the Rules of this Court. Foreign plaintiffs Stalexport and Huta Czestochowa ("Stalexport"), a Polish plate exporter and a Polish plate steel mill, respectively; Metalexportimport S.A. ("Metalexportimport"), a Romanian steel exporter; Rautaruukki Oy ("Rautaruukki"), a Finnish plate producer; and Fabrique de Fer de Charleroi, S.A. ("Charleroi"), a Belgian plate producer, (collectively "Respondents"), challenge the United States International Trade Commission's (the "Commission" or the "ITC") affirmative final determination that an industry in the United States producing plate is materially injured by reason of less than fair value ("LTFV") cut-to-length steel plate products ("plate") from Belgium, Poland, Finland and Romania and by subsidized plate imports from Belgium. Respondents contend that the Commission erroneously cumulated Belgian, Polish, Finnish and Romanian plate imports in its material injury analysis. The views of the Commission [1] are contained in *Certain Flat–*

---

1. The members of the Commission at the time of issuance of these determinations were Chairman

*Rolled Carbon Steel Products From Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, New Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom* ("Final Determination")[2], USITC Pub. No. 2664 at 211, Inv. Nos. 701–TA–319–332, 334, 336–342, 344 and 347–353 and Inv. Nos. 731–TA–573–579, 581–592, 594–597, 599–609 and 612–619 (Aug. 1993) (final determ.); 58 Fed.Reg. 43,905 (1993).[3] Domestic producers of plate, U.S. Steel Group, a Unit of USX Corporation, Geneva Steel, Gulf States Steel, Inc. of Alabama, and Sharon Steel Corporation ("U.S. Steel Group"); and Bethlehem Steel Corporation, Inland Steel Industries, Inc. and Lukens Steel Company ("Bethlehem Group"), (collectively "U.S. Steel Group *et al.*"), appear in support of the government.

Petitioners below, U.S. Steel Group *et al.* as plaintiffs (collectively "Petitioners"), oppose the Commission's negative material injury final determination for LTFV and subsidized plate products from France and Korea.[4] *Id.* Petitioners allege that the Commission erroneously excluded French and Korean plate imports from cumulation in its material injury analysis. Defendant-intervenors Usinor Sacilor, Sollac and GTS ("Usinor") and Pohang Iron & Steel Co., Ltd., appear in support of the government.

The plate at issue was identified by Commerce as a separate "class or kind" of merchandise subject to investigation and described as follows:

*Certain Cut-to-Length Carbon Steel Plate*

These products include hot-rolled carbon steel universal mill plates (*i.e.*, flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 millimeters but not exceeding 1,250 millimeters and of a thickness of not less than 4 millimeters, not in coils and without patterns in relief), of rectangular shape, neither clad, plated nor coated with metal, whether or not painted, varnished, or coated with plastics or other nonmetallic substances; and certain hot-rolled carbon steel flat-rolled products in straight lengths, of rectangular shape, hot rolled, neither clad, plated, nor coated with metal, whether or not painted, varnished, or coated with plastics or other nonmetallic substances, 4.75 millimeters or more in thickness and of a width which exceeds 150 millimeters and measures at least twice the thickness.... Included in these investigations are flat-rolled products of nonrectangular cross-section where such cross-section is achieved subsequent to the rolling process (*i.e.*, products which have been "worked after rolling")—for example, products which have been bevelled or rounded at the edges. Excluded from these investigations is grade X–70 plate.

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold–Rolled Carbon Steel Flat Products From Argentina,*

Newquist, Vice Chairman Watson, and Commissioners Rohr, Brunsdale, Crawford and Nuzum. This opinion refers to the members of the Commission by the title "Commissioner" without regard for rank or any subsequent changes in title.

Regarding the countries at issue, the Commissioners joined portions of the relevant determinations as follows: Commissioner Nuzum joined in all portions of these determinations except that she dissented from the majority's negative determination with respect to imports from France. Commissioners Rohr and Watson joined all portions of the determinations. Commissioner Crawford joined the discussion of these determinations except the negligibility and causation analysis with respect to Poland and Romania. Commissioner Brunsdale joined these determinations through the discussion of cumulation except as it applies to Poland and Romania. She also joined the discussion of the threat of material injury, finding that an industry in the United States is not materially injured or threatened with material injury by reason of LTFV and/or subsidized imports from Poland or Romania. Threat of material injury is not an issue in these appeals. Commissioner Newquist joined only the discussion of like product, domestic industry and condition of the domestic industry. *Final Determination* at 211 n. 2.

2. This opinion will refer to Volume II of the Commission's determinations as the *Staff Report.*

3. The Commission also found material injury by reason of cumulated imports from Brazil, Canada, Germany, Mexico, Spain, Sweden and the United Kingdom. *Id.* at 211; 58 Fed.Reg. at 43,905.

4. Petitioners have appealed the Commission's negative determinations for plate products from France and Korea as part of consolidated case number 93–09–00553–INJ.

58 Fed.Reg. 37,062, 37,064 (Dep't Comm. 1993) (final determ.); *see also Final Determination* at 213.

Cut-to-length plate is generally used in construction, industries producing machinery, industrial equipment, tools, rail freight cars, shipbuilding/marine equipment, and by service centers which reportedly sell the product to construction companies. *Staff Report* at I–34, I–35, table 9.

## BACKGROUND

The final determinations herein appealed are the culmination of numerous concurrent ITC investigations based on petitions filed on June 30, 1992, alleging that an industry in the United States producing cut-to-length carbon steel plate is materially injured or threatened with material injury by reason of LTFV and/or subsidized plate products from, *inter alia*, Belgium, Finland, Poland, Romania, France and Korea. These investigations encompassed twenty-one countries and covered the following four classes or kinds of imported flat-rolled carbon steel: hot-rolled carbon steel, cold-rolled carbon steel, corrosion-resistant carbon steel and cut-to-length steel plate.

On August 14, 1992, the Commission issued notice of its preliminary determination that there was a reasonable indication that the United States domestic steel plate industry was materially injured or threatened with material injury by reason of imports of allegedly subsidized and dumped steel plate from, *inter alia*, Belgium, Poland, Finland, Romania, France and Korea. *See Certain Flat–Rolled Carbon Steel Products From Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, Korea, Mexico, The Netherlands, New Zealand, Poland, Romania, Spain, Sweden, Taiwan, and the United Kingdom,* USITC Pub. No. 2549, Inv. Nos. 701–TA–

319–354 and 731–TA–573–620 (Aug. 1992) (preliminary determ.); *Certain Flat–Rolled Carbon Steel Products,* 57 Fed.Reg. 38,064 (1992).

Effective December 7, 1992 and February 4, 1993, the Commission instituted final material injury investigations under section 705(b) of the Tariff Act of 1930 (the "Act"), as amended, 19 U.S.C. § 1671d(b) (1988), and under section 735(b) of the Act, as amended, 19 U.S.C. § 1673d(b) (1988), with respect to Belgium, Poland, Finland, Romania, France and Korea, which the Department of Commerce, International Trade Administration ("Commerce"), had preliminarily determined were being subsidized by the governments of those countries and/or were being sold in the United States at LTFV. The Commission published notices of these investigations on December 18, 1992 and February 18, 1993. *See Certain Flat–Rolled Carbon Steel Products From Austria, Belgium, Brazil, France, Germany, Italy, Korea, Mexico, New Zealand, Spain, Sweden, and the United Kingdom; Institution of Final Countervailing Duty Investigations,* 57 Fed.Reg. 60,247 (USITC 1992); *Certain Flat–Rolled Carbon Steel Products From Argentina et al.,* 58 Fed.Reg. 8,974 (USITC 1993).

The Commissioners voted on the final subsidy and LTFV investigations on July 27, 1993.

*The ITC's Final Affirmative Injury Determinations*

In its preliminary investigations, the Commission found a single like product consisting of cut-to-length carbon steel plate corresponding to Commerce's single class or kind of imported steel plate and, consequently, found one domestic industry producing all steel plate.[5] *Final Determination* at 214–16.

---

**5.** In determining whether an industry in the United States is materially injured or threatened with material injury by reason of the subject imports, the Commission must first define the "like product" and the "industry." The statute defines "like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation...." 19 U.S.C. § 1677(10) (1988). In turn, the statute defines the relevant

domestic industry as "the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product...." 19 U.S.C. § 1677(4)(A) (1988). The Commission is required to assess the effects of subsidized or dumped imports in relation to the United States production of the like product within that industry. 19 U.S.C. § 1677(4)(D) (1988).

The Commission reasoned that affirmative injury determinations were appropriate for Belgium, Poland, Finland and Romania because the domestic plate industry was materially injured as a result of the significant volume and price effects of cumulated imports.[6] *Id.* at 243. The Commission's determination took the following into consideration. During the period of investigation ("POI"), U.S. consumption fell by 11.9% and the domestic industry's market share of this decreasing apparent domestic consumption fell by 0.8 percentage points. *Id.* at 243. The domestic industry's capacity utilization also decreased by 3.9 percentage points and profitability fell from an operating income of $211 million to an operating loss of $84 million, a drop of 139.6 percentage points. *Id.* In contrast, the volume of cumulated imports as a percentage of apparent domestic consumption was relatively high, peaking in 1992, while absolute volumes of cumulated imports decreased between 1990 and 1991, before increasing again in 1992. *Id.* at 237.

Regarding the price effects of the subject imports, the Commission found that domestic cut-to-length plate was substitutable with cumulated imports of plate and that the plate market was sensitive to price. *Id.* at 238. The Commission determined that plate was commonly produced to a few ASTM specifications, with A36 considered the most common grade and A572 and A656 grades also considered very common. *Id.* The Commission found that these three grades accounted for a majority of both U.S. producers' and cumulated importers' annual U.S. shipments. *Id.* The Commission concluded that plate did not involve particularly unique production processes and that most domestic and foreign plate mills were capable of producing plate products which met the most common ASTM specifications. *Id.* at 238–39. The Commission did not regard plate as requiring highly detailed customer specifications and saw it as generally involving no further processing once sold. *Id.* at 239. Substitutability was evidenced by pricing data which indicated that domestic and cumulated imports

were documented in all four of the commercial grade pricing series and in twelve out of fifteen niche products. *Id.* The Commission also found evidence of substitutability in the form of reports from twenty-six purchasers indicating that cumulated imports of plate were comparable to domestic plate in quality, as compared with only two reports of inferior foreign product and one report of superior foreign product. *Id.* Pricing data for the commercial grade plate products also indicated that the imports cumulated showed considerably more underselling than overselling. *Id.* at 240.

In addition, pricing trends evidenced price suppression and depression by reason of the cumulated imports. *Id.* at 241. Cumulated imports routinely undersold domestic plate and the Commission confirmed considerable number of allegations of lost sales and lost revenues attributable to the cumulated subject imports. *Id.* at 242. Further, unit production costs for domestic plate rose during the POI while market prices for domestic plate declined. *Id.* at 241.

*The ITC's Final Negative Injury Determination*

The Commission also concluded that negative injury determinations were appropriate for France and Korea because the domestic plate industry was not materially injured by reason of French and Korean plate imports. *Id.* at 244. The Commission based its determinations on its findings that, during the POI, French and Korean imports were insignificant in absolute volume and as a share of apparent domestic consumption. *Id.* The Commission found no persuasive evidence that French and Korean imports independently had a significant suppressing or depressing effect on domestic prices and concluded that the volume, value and market share of French and Korean imports were too small to have any significant adverse effect on domestic prices. *Id.*

*Standard of Review*

The Court must uphold the Commission's determination unless it finds that the deter-

---

**6.** To determine whether material injury has occurred by reason of subsidized or LTFV imports under investigation, the Commission evaluates the volume of imports, their effect on domestic prices, the impact on domestic production of the merchandise at issue, and other relevant economic factors. 19 U.S.C. § 1677(7)(B) (1988).

mination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

## DISCUSSION

*CUMULATION*

### BELGIUM

Belgian respondent, Charleroi, contends that, except for the improper cumulation of South Africa's import statistics, the Commission's analysis of volume and price effects would have been based on lower absolute volumes and smaller market shares of U.S. consumption for the remaining cumulated countries and the Commission's injury analysis would have resulted in a final negative injury determination for plate. *Brief in Support of Plaintiff's Motion for Summary Judgment* ("*Charleroi's Brief*") at 37, 43. Charleroi does not otherwise contest any aspect of the Commission's determination regarding Belgium.

Charleroi points out that the ITC is not required to determine material injury in the case of South Africa because it is not a "country under the Agreement" within the meaning of section 701(b) of the Act. Charleroi further argues that the Commission erred in cumulating South African plate imports because such imports did not satisfy the cumulation requirements of 19 U.S.C. § 1677(7)(C)(iv) (1988 & Supp. V 1993). Essentially, Charleroi contends that South African plate imports were not "subject to investigation" and did not "compete" with other such imports and with the domestically produced like product. *Charleroi's Brief* at 1–15.

Charleroi makes several arguments in support of the position that South African plate was not subject to investigation. Specifically, Charleroi first argues that the countervailing duty investigation of South African plate imports was filed under section 303 of the Act, as amended, 19 U.S.C. § 1303 (1988), and imports investigated pursuant to section 303 are not "subject to investigation" within the statutory meaning of the cumulation provision. Charleroi asserts that 19 U.S.C. § 1677(7)(C)(iv) only applies to investigations conducted under Subtitle IV of Title 19, whereas section 303 investigations fall under Subtitle II of that title. *Id.* at 2, 22–23. In support, Charleroi argues that, as the cumulation provision is contained in the definitions section of § 1677 of Subtitle IV, it applies only to countervailing or anti-dumping duty investigations brought under 19 U.S.C. § 1671 or 19 U.S.C. § 1673 of Subtitle IV, *i.e.*, section 701 and 731 investigations. Charleroi contends that this is indicated by the section's introductory phrase "for purposes of this subtitle." *Charleroi's Brief* at 22.

Charleroi also contends that the differing language in the material injury provision, 19 U.S.C. § 1677(7) (1988), and the threat of material injury provision,[7] shows that Congress intended to exclude section 303 imports from cumulation for material injury purposes. In support, Charleroi asserts that the threat provision explicitly authorizes cumulation of imports subject to investigation under sections 303, 701 and 731, to the extent prac-

---

7. 19 U.S.C. § 1677(7)(F)(iv) (1988 & Supp. V 1993), the threat of material injury provision, states:

> To the extent practicable and subject to subparagraph (C)(iv)(II) and (v), for purposes of clauses (i)(III) and (IV) the Commission may cumulatively assess the volume and price effects of imports from two or more countries if such imports—
> (I) compete with each other, and with like products of the domestic industry, in the United States market, and
> (II) are subject to any investigation under section 1303, 1671, or 1673 of this title.

ticable. Charleroi points out that the material injury provision does not similarly reference section 303. In addition, Charleroi contends that the qualifier, "to the extent practicable," in the "threat" provision indicates that Congress was not confident that it would even be possible to cumulate imports from sections 303, 701 and 731 investigations, particularly in light of the fact that section 303 investigations are not subject to injury determinations by the Commission. Charleroi suggests that cumulation was made discretionary for threat purposes due to this concern, but the injury provision is mandatory because it is restricted to imports subject to investigation under sections 701 and 731. *Charleroi's Brief* at 24–27.

Charleroi further contends that a Commerce preliminary or final subsidy or LTFV determination is a prerequisite to a Commission final material injury determination cumulating South African plate import data.[8] Charleroi points to the sequential arrangement of the trade relief laws as indicating the proper progression. *See* 19 U.S.C. §§ 1671d(a)(1), (b)(1) (1988) and 1673d(a)(1), (b)(1) (1988). *Charleroi's Brief* at 28–31.

Lastly, Charleroi alleges that the Commission's decision to cumulate South Africa import data based solely on information provided by petitioners violates principles of due process and fairness. *Id.* at 31–32.

Charleroi also argues that the record fails to support the Commission's conclusions drawn in the "general" competition analysis and the Commission's findings regarding factors assessed. *Id.* at 2, 14–17. Specifically, Charleroi argues that, as the Commission admitted it had no information indicating the grade of South African plate imports, it inaccurately found that all countries made at least some portion of their sales in the commercial grade and niche products covered by the questionnaires. Charleroi submits that without information pertaining to plate

grade, the Commission could not (1) decide the "domestic like product"; (2) evaluate whether South African plate was distributed through common or similar channels as other subject imports and the domestic like product; or (3) assess pricing data, especially with respect to fungibility and assessment of over- and underselling. *Id.* at 18–19. In addition, Charleroi contends that South African plate products were not present "simultaneously" with other imports and the domestic like product because they were imported during only nine months of the POI. *Id.* at 20. Charleroi argues that, absent a showing of competition, there is no causal nexus between the specific imports and injury. *Id.* at 10, 37.

Among other arguments, the Commission argues that it generally has cumulated imports even where there were alleged differences between the imports and domestic products. *See, e.g., Silicon Metal From the People's Republic of China,* USITC Pub. No. 2385 at 22–24, Inv. No. 731–TA–472 (June 1991) (final determ.). *Defendant United States International Trade Commission's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record ("ITC's Brief")* at 77.

In assessing whether there is present material injury to the domestic industry by reason of subsidized or LTFV imports, the Commission is mandated to cumulatively assess the volume and effects of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market. 19 U.S.C. § 1677(7)(C)(iv).

■ The Court disagrees with Charleroi that South African plate imports are not subject to investigation for purposes of the Commission's material injury determination. The phrase "subject to investigation" con-

---

**8.** On May 13, 1993, petitioners filed a countervailing duty petition with Commerce with respect to plate from South Africa and other products. On June 10, 1993, Commerce published notice of its *Initiation of Countervailing Duty Investigations: Certain Carbon Steel Flat Products From South Africa,* 58 Fed.Reg. 32,515. On September 13, 1993, Commerce published notice of its *Preliminary Negative Countervailing Duty Determinations: Certain Steel Products From South Africa,* 58 Fed.Reg. 47,865. On November 24, 1993, Commerce published notice of its *Final Negative Countervailing Duty Determinations: Certain Steel Products From South Africa,* 58 Fed. Reg. 62,100.

tained in the mandatory cumulation provision is neither defined in 19 U.S.C. § 1677, nor limited in any explicit way by the statute to investigations conducted under Subtitle IV.[9] Thus, the limitation Charleroi alleges in § 1677, on its face, does not apply.

Further, Charleroi's reliance on language differences in the injury and threat provisions is misplaced. First, Charleroi fails to disclose that the language originally proposed in the House of Representatives trade bill, H.R. 3, 100th Cong., 1st Sess. (1987), for cumulation with respect to present injury and threat of material injury, was identical in making cumulation applicable to imports subject to all antidumping and countervailing duty investigations.[10] Hence, it cannot be seriously argued that Congress intended to allow the cumulation of imports subject to *all* Title VII investigations only in the threat context.[11]

Second, the Committee Report reveals that the threat provision is discretionary because such determinations involve projections regarding future developments which involve difficult predictions regarding trends, and

distant trends for different sources of imports might argue against cumulation.[12] The House bill was adopted but was made discretionary. The House Report on the provision in question reads as follows:

> The Committee intends, by requiring cumulation to the extent practicable in determining threat of material injury that the ITC apply the same principles regarding normal or cross-cumulation in threat determinations as it would apply in material injury determinations.... Moreover, the Committee recognizes the difficulty of applying the concept of cumulation to threat cases, and does not seek to require cumulation *where it is impracticable to do so because such assessment would be conjectural or speculative.*

H.R.Rep. No. 40, 100th Cong., 1st Sess., pt. 1, at 131 (1987) (emphasis added); *see Asociacion Colombiana de Exportadores v. United States,* 12 CIT 1174, 704 F.Supp. 1068 (1988).

Moreover, South African plate was subject to investigation by Commerce at the time of

**9.** It is noteworthy that in *Chaparral Steel Co. v. United States,* 901 F.2d 1097 (Fed Cir.1990) (interpreting the phrase "subject to investigation" in a countervailing duty investigation context), some of the imports at issue originated in South Africa *yet the court did not consider,* and *no* party raised, the argument presently advanced by Charleroi.

**10.** Section 154 of H.R. 3 states:
> (iv) CUMULATION.—For purposes of clauses (i) and (ii), the Commission shall cumulatively assess the volume and price effects of imports from two or more countries if such imports compete with each other, and with like products of the domestic industry, in the United States market, and if such imports—
> (I) are subject to any investigation under section 303, 701, or 731;
> (II) are subject to any final order or suspension agreement resulting from an investigation under section 303, 701, or 731; or
> (III) were entered before any quantitative restraint was imposed, if such restraint was the basis on which a petition filed under section 303, 701, or 731 was withdrawn after the administering authority made an affirmative preliminary determination on the petition.

H.R. 3, Section 154 at 195–96. Compare the wording of the threat provision:
> (iii) CUMULATION.—To the extent practicable and subject to paragraph (C)(v), for pur-

poses of clause (i)(III) and (IV), the Commission shall cumulatively assess the volume and price effects of imports from two or more countries if such imports—
> (I) compete with each other, and with like products of the domestic industry, in the United States market; and
> (II) are subject to any investigation under section 303, 701, or 731.

H.R. 3, Section 154 at 200.

**11.** The Court believes that Section 154 of H.R. 3 was not contained in the final bill because of the more controversial provisions regarding the treatment of imports subject to voluntary restraint agreements or to revocations of orders. *See Chaparral Steel Co.,* 901 F.2d at 1106.

**12.** The conference report states:
> The House bill amends section 771(7) of the Tariff Act to require the ITC, in determining threat of material injury, to cumulate, to the extent practicable, the volume and price effects of imports from two or more countries if such imports are currently subject to any antidumping or countervailing duty investigation, and such imports compete with each other and with like products of the domestic industry. H.R.Conf.Rep. No. 576, 100th Cong., 2d Sess. 620 (1988), U.S.Code Cong. & Admin.News 1988, pp. 1547, 1653.

the Commission's final injury determination. *See Initiation of Countervailing Duty Investigations: Certain Carbon Steel Flat Products From South Africa,* 58 Fed.Reg. at 32,-515. The Commission has uniformly determined that if imports are subject to Commerce investigations, the volume and price effects of such imports can be cumulated even absent a separate material injury investigation. *See Certain Fresh Cut Flowers From Canada, Chile, Colombia, Costa Rica, Ecuador, Israel, Kenya, Mexico, the Netherlands, and Peru ("Certain Fresh Cut Flowers"),* USITC Pub. No. 1877, Inv. Nos. 303–TA–17–18 and 701–TA–275–278 (July 1986) (preliminary determ.). *See also Certain Forged Steel Crankshafts From the Federal Republic of Germany and the United Kingdom,* USITC Pub. No. 2014 at 14, Inv. Nos. 731–TA–351 and 353 (Sept. 1987) (final determ.) (Japanese crankshaft imports subject to an ongoing investigation by Commerce which may (or may not) result in a final determination of LTFV sales and, accordingly, are subject to investigation within the meaning of the statute); *Chaparral Steel Co.,* 901 F.2d at 1097 (imports no longer subject to a pending investigation not subject to cumulation); *United Eng'g & Forging v. United States,* 15 CIT 561, 582, 779 F.Supp. 1375, 1393 (1991), *aff'd without op.,* 996 F.2d 1236 (1993). The statute "does not require that imports be subject to an *injury* investigation for cumulation to be required." *Certain Fresh Cut Flowers,* USITC Pub. 1877 at 12, Inv. Nos. 303–TA–17–18 and 701–TA–275–278.

Therefore, South African plate imports were subject to investigation.

Charleroi's arguments concerning competition also fail. In the plate determinations, the Commission adopted the discussion of competition legal standards, as well as the discussion of the factors considered in applying those legal standards contained in § IV(A) of the Commission's views on hot-rolled carbon steel. *See Final Determina-*

tion at 219 referring to the Commission's views at 24–27 (discussion of competition-related requirements concerning cumulation). Accordingly, in assessing whether a reasonable overlap of competition existed, the Commission evaluated: (1) the degree of fungibility among imports and with the domestic like product; (2) the presence of sales or offers to sell in the same geographical markets; (3) the existence of common or similar channels of distribution; and (4) whether the products were simultaneously present in the market.[13] *Final Determination* at 24–25 n. 103. *See also United Eng'g & Forging,* 15 CIT at 582, 779 F.Supp. at 1393; *Fundicao Tupy S.A. v. United States,* 12 CIT 6, 10–11, 678 F.Supp. 898, 902, *aff'd,* 859 F.2d 915 (Fed.Cir.1988). These factors are not exhaustive and no single factor is determinative. *Wieland Werke, AG v. United States,* 13 CIT 561, 563, 718 F.Supp. 50, 52 (1989). Further, only a "reasonable overlap" of competition is required. *Id.* at 563, 718 F.Supp. at 52 (completely overlapping markets are not required); *Granges Metallverken AB v. United States,* 13 CIT 471, 477, 716 F.Supp. 17, 21–22 (1989) (the Commission need not track each sale of individual sub-products and their counterparts to show competition, but need only find evidence of reasonable overlap of competition).

In the competition discussion which was adopted, the Commission noted that plate quality was an important element of fungibility.[14] The Commission observed that it assessed the fungibility of the subject imported products, *i.e.,* their relative substitutability with the domestic and imported products, in part, by considering pricing data on commercial grade and niche products obtained from its questionnaires. *Final Determination* at 26–27. The Commission viewed consistent and significant price differentials, underselling or overselling, between what otherwise should be comparable domestic and imported products, as some evidence tending to show a

---

**13.** Commissioner Rohr took no position with respect to South Africa. *Final Determination* at 24 n. 102.

**14.** Commissioners Rohr and Nuzum noted, however, that while they took quality differences

among products into account in determining the existence of competition, they considered perceived quality differences to be less important than other factors. *Id.* at 26 n. 118.

lack of competition.[15] *Id.* However, the Commission observed that not all price differences can be explained by differences in the merchandise, that different pricing does not necessarily reflect differences in merchandise, and that nonprice considerations can also affect competition in the marketplace. *Id.*

In its cumulation discussion concerning plate, the Commission found that (1) each of the fourteen countries investigated sold at least some of the same commercial grade and/or niche products as did the rest of the group of countries; (2) imports of commercial grade and/or niche products from each country were present in the market with comparable domestic product; (3) where there was no comparable domestic production, niche products constituted a very small percentage of imports from any one country; (4) imports and domestic like products were sold through the same channels of distribution, *i.e.*, were sold to end users and steel service distribution centers; and (5) plate products from all fourteen countries were imported into the United States in most, if not all, months of the POI; were sold in at least two of the four regions of the United States during the POI; and, the majority of imports from most countries were sold in all four regions. *Final Determination* at 220.

Therefore, the Commission reasonably concluded that, before cumulation, a reasonable overlap of competition existed between plate imports from each of the fourteen countries[16] subject to the investigation and with the domestic products. *See id.*

Charleroi's allegation that the decision to cumulate South Africa was based solely on information from petitioners, mischaracterizes the information before the Commission. In the country specific cumulation discussion, the Commission made findings particular to South Africa which support a finding of competition.

Although South African plate imports entered the United States during the POI beginning in March 1992, they were not isolated. South African plate was present in all four geographic regions of the United States, the East, Gulf, Great Lakes, and West customs districts, through seven plate importers, all of whom were steel distribution centers. *Id.* at 233. South African plate accounted for 1.6% of apparent share of domestic consumption, more than any other subject country except Sweden and Canada. *Staff Report* at I–142, table 101. Further, South Africa was the third largest exporter of plate products to the U.S. market in 1992. *Id.* at I–133, table 93. Although South Africa had no imports in 1990 and 1991, South Africa shipped almost 80,000 tons of plate into the United States in 1992. *Id.* At a dollar value of $26 million, these imports were not insignificant.[17] *Id.* at I–133, table 93. Hence, there was substantial evidence supporting the Commission's finding of a sufficient overlap of competition between South African plate imports, other subject imports, and domestically produced plate.

 Admittedly, the Commission had no specific information concerning the grades of plate products which made up South African imports, *i.e.*, information indicating whether they were commercial or specialized niche products. *Final Determination* at 233. However, it reasoned that the low unit values of South African plate imports, the third lowest of the subject countries, suggested that South African products were not specialized plate products that commanded a price premium.[18] *Id.* Commissioner Rohr made the following observations regarding plate:

---

**15.** Commissioner Rohr did not view the margins of over- and underselling to be probative of the presence or absence of competition. *Id.* at 27 n. 122. Commissioner Nuzum noted that overselling alone is not sufficient to establish a lack of competition, and that imports may have adverse effects even though they oversell the domestic product. *Id.* at 27 n. 123.

**16.** South Africa was not among the fourteen countries investigated.

**17.** There were no imports from South Africa in October 1992. *Final Determination* at 233 n. 203.

**18.** In 1992, the unit value for South African plate imports was $331, whereas the unit value for the domestic product was $401. *See Staff Report* at I–134, table 93; *Staff Report,* Appendix C at C–3, table C–1.

[P]late is the least differentiated and specialized of the four product categories. It is the most commodity-like. As the majority notes, a very large percentage of this product category is sold in a few, long established, well known grades in [sic] which are produced by most domestic and foreign producers.

*Id.* (Additional and Dissenting Views of Commissioner Rohr) at 255. Thus the plate entering the domestic market was within a limited range of products and the Commission had no reason to believe that South African plate product was any different.

Hence, the Commission was justified in relying on pricing data to conclude that South African plate imports were likely to be of the commercial grade categories which comprised the bulk of plate imports from the other countries included in these investigations. Moreover, the court has accepted the Commission's practice of finding a reasonable overlap of competition in spite of perceived product quality differences and despite one product commanding a premium price. *See Metallverken Nederland B.V. v. United States,* 13 CIT 1013, 1025, 728 F.Supp. 730, 740 (1989) (de-emphasizing the importance of quality differences and, therefore, price differences). Likewise, the Commission was justified in basing its decision on the channels of distribution through which such imports were distributed. Therefore, South African plate competed.

Accordingly, the Court finds that, based on the record taken as a whole, the Commission properly cumulated the volume and price effects of plate imports from South Africa in its injury analysis.

*Negligibility*

Cumulation is discretionary if imports of the investigated product are negligible and have no discernible adverse impact on the domestic industry. 19 U.S.C. § 1677(7)(C)(v) (1988). For purposes of determining whether imports are negligible, the Commission shall evaluate all relevant economic factors

regarding the imports, including, but not limited to, whether—

(I) the volume and market share of the imports are negligible,

(II) sales transactions involving the imports are isolated and sporadic, and

(III) the domestic market for the like product is price sensitive by reason of the nature of the product, so that a small quantity of imports can result in price suppression or depression.

19 U.S.C. § 1677(7)(C)(v).

In its cut-to-length plate determinations, the Commission adopted the discussion of negligibility contained in § IV(A) of the Commission's views on hot-rolled steel. *See Final Determination* at 219 referring to the Commission's views at 28–32. The Commission's negligibility discussion set forth the statutory standard, addressed relevant legislative history, and discussed economic factors the Commission considered determinative of negligibility. *Id.* at 28–32.

■ Respondents in the underlying proceeding, Stalexport, Rautaruukki and Metalexportimport contend that Polish, Finnish and Romanian plate qualified for the negligible imports exception to mandatory cumulation.[19] *Moving Brief on Behalf of Plaintiffs, Stalexport and Huta Czestochowa ("Stalexport's Brief")* at 18; *Brief in Support of Rule 56.2 Motion of Plaintiff Rautaruukki Oy for Judgment on Agency Record ("Rautaruukki's Brief")* at 8–9; *Memorandum in Support of the Motion of Metalexportimport S.A. for Judgment on the Agency Record ("Metalexportimport's Brief")* at 2–3.

Defendant-intervenors, U.S. Steel Group et. al., submit that in *Certain Circular, Welded, Non–Alloy Steel Pipes and Tubes From Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela,* USITC Pub. No. 2454 at 20–24, Inv. No. 701–TA–311 (Nov. 1991) (preliminary determ.) (market share of Venezuelan standard pipe ranged from 0.4% to 0.9%) and in *Coated Groundwood Paper From Austria, Belgium, Fin-*

---

19. The Commissioners were evenly divided regarding application of the negligibility exception to Polish and Romanian plate imports. *See Final Determination* at 277, 330, 335 (Commission-

ers Newquist, Brunsdale and Crawford voting in the negative). Pursuant to 19 U.S.C. § 1677(11) (1988), if the vote is evenly divided, the determination is deemed to be in the affirmative.

land, France, Germany, Italy, the Netherlands, Sweden, and the United Kingdom, USITC Pub. No. 2359 at 25, Inv. No. 731–TA–486 through 494 (Feb. 1991) (preliminary determ.), the Commission declined to apply the negligible imports exception even though the respective market share of imports was substantially less than 1%.[20] *Brief in Opposition to Plaintiffs' Motion for Judgment on the Agency Record ("U.S. Steel Group et al.'s Brief")* at 12–13.

## POLAND

Respondent Stalexport takes issue with the Commission's determination concerning Poland on several grounds. First, Stalexport maintains that Commissioner Watson's affirmative vote is inconsistent with his individual finding that the domestic plate market is not statutorily price sensitive.[21] *Stalexport's Brief* at 20–21.

Stalexport also argues that Polish plate imports could not have affected domestic prices as they constituted a very small share of domestic plate consumption, were declining in volume and value, and their dollar value was insignificant. *Id.* at 3, 19. Stalexport insists that Poland's small share of the domestic market puts it squarely within the holding of *Torrington Co. v. United States,* 16 CIT 220, 790 F.Supp. 1161 (1992), *aff'd without op.,* 991 F.2d 809 (Fed.Cir.1993), which recognized that the legislative history of the negligible imports exception guides the Commission to "interpret the negligible import exception 'in a manner that makes sense given the realities of the marketplace.' " *See Torrington Co.,* 16 CIT at 228, 790 F.Supp. at 1171 (quoting H.R.Rep. No. 40, 100th Cong., 1st Sess., pt. 1, at 131 (1987). *Stalexport's Brief* at 24–25. Stalexport emphasizes that Poland's plate domestic market share, like that of imports not cumulated in *Torrington,* was under 1%.[22] *Stalexport's Brief* at 25.

Stalexport also objects to Commissioner Nuzum's reliance on Commerce's finding of a 62% antidumping duty margin for Polish plate. According to Stalexport, Commerce adopted the wrong methodology to determine Poland's foreign market value, treating it as a nonmarket economy pursuant to 19 U.S.C. § 1677b(c) (1988) although it found that Poland was a market economy country during the POI. *Stalexport's Brief* at 22–23. Stalexport argues that Commerce's dumping duty calculation was flawed because it was not based on a market economy country analysis and, therefore, Commissioner Nuzum's reliance on that dumping margin was improper. *Id.* at 23.

Finally, Stalexport argues that its plate imports could not have had a discernible adverse impact on the domestic plate industry as the imports were isolated and sporadic. In support, Stalexport argues the complexities of Polish imports. It refers to difficulties associated with multi-party sales negotiations, the inconvenience of conforming production to U.S. requirements, transportation problems, delivery time lags of 4–6 months after contracting, quality problems, and prepayment requirements which tie up an importer's working capital. *Id.* at 6–12. Stalexport also contends that plate sales to U.S. purchasers are handicapped by Poland's ability to supply plate only in limited dimensions. *Id.* at 7–8.

U.S. Steel Group *et al.* assert that the dimensions in which Polish plate is generally imported are quite common. *U.S. Steel Group et al.'s Brief* at 32 n. 81.

■ The Court finds that the Commission reasonably exercised its discretion in declining to exclude Polish plate imports from cumulation on the basis that competing Polish imports were not negligible and had an adverse impact on the domestic industry.

---

**20.** In *Coated Groundwood Paper,* USITC Pub. No. 2359 at 33–35, the Commission applied the negligible exception to Austrian imports emphasizing that they were isolated and sporadic.

**21.** The domestic market is "price sensitive" by reason of the nature of a particular product if "a small quantity" of imports of that product results

in "price suppression or depression." *See* 19 U.S.C. § 1677(7)(C)(v)(III) (1988).

**22.** The percentages of import share of apparent domestic consumption of the 12 countries found to be negligible in *Torrington* ranged from .2% to .8%. *Torrington Co.,* 16 CIT at 228, 790 F.Supp. at 1171.

The Commission's decision relied on various factors. Specifically, Polish imports increased from 25,546 tons in 1990 to 38,357 tons, and then decreased to 24,605 tons valued at $7 million in 1992. *Staff Report* at I–133, table 93. Poland's share of apparent domestic consumption for the POI increased from 0.5% in 1990 to 0.8% in 1991 before returning to 0.5% in 1992. *Id.* at I–142, table 101. With regard to the statutory factor of "isolated and sporadic," Polish plate sales were made in three of the four regions of the United States in 25 to 36 months and through six importers. *Final Determination* at 232. In addition, Polish commercial grade plate was present simultaneously in the market with similar domestic and imported products 1 and 4 in the Commission's pricing series. None of the Polish plate imports were in any alleged niche categories. *Id.* The Commission also took into consideration the statutory factor of price sensitivity [23]. *See id.*

Further, Stalexport's objection with respect to an alleged inconsistency in Commissioner Watson's findings is without merit. Commissioner Watson's participation in the majority's cumulation decision was subject to his separate findings that the plate market is not price sensitive. Therefore, the Court finds no divergence between Commissioner Watson's separate views on this matter and the opinion in which he joined where the majority found the domestic market to be price sensitive. In addition, Commissioner Crawford's economic analysis of price sensitivity has been found acceptable by this court. *See United States Steel Group v. United States*, 18 CIT ——, ——, 873 F.Supp. 673, —— (1994). As Commissioner Crawford's price sensitivity analysis and her application of economic theory are a viable approach, Commissioner Watson's concurrence in her findings is similarly upheld. Moreover, the Court observes that, Commissioner Watson's concurrence that the domestic market is not statutorily price sensitive does not preclude a finding that Polish plate imports had adverse price effects. Therefore, no remand is required on this basis.

Significantly, in recognition of the fact that the amount of foreign competition which domestic industries may be able to withstand will vary depending on their history of exposure to unfair import competition, the cumulation statute does not provide a specific numerical standard against which to measure negligibility. 19 U.S.C. § 1677(7)(C)(v); *see* H.R.Rep. No. 40, 100th Cong., 1st Sess., pt. 1, at 131 (1987). *See also Torrington Co.*, 16 CIT at 229, 790 F.Supp. at 1171. Therefore, there is no numerical bright line for determining whether imports are negligible. Congress intended that the Commission apply the negligible imports exception narrowly and only in circumstances where it is clear that imports from a particular investigated source are so small and so isolated that they could not possibly be impacting injuriously on the relevant U.S. industry. The Commission is to apply this exception with "particular care in situations involving fungible products, where a small quantity of low-priced imports can have a very real effect on the domestic market." H.R.Rep. No. 40 at 130–31. In addition, the House and Conference Reports stress that the negligibility exception is to be used sparingly and that it is not to be used to subvert the purpose and general application of the mandatory cumulation requirement. *See id.* at 131; H.R.Conf.Rep. No. 576, 100th Cong., 2d Sess. 621 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1654.

**23.** Only Commissioners Newquist and Nuzum found the domestic plate market to be price sensitive. *Final Determination* at 238 n. 250. Commissioner Rohr found a high degree of price sensitivity for plate relative to the other products in these investigations. *Id.* (Additional and Dissenting Views of Commissioner Rohr) at 255. Commissioner Crawford found, and Commissioner Watson concurred, that while the cut-to-length plate market was not price sensitive as defined in the statute, it was more sensitive to price than the hot-rolled, cold-rolled, and corrosion-resistant steel markets. *Id.* at 225 n. 112; 238 n. 250; 342 (Additional and Dissenting Views of Commissioner Crawford). Commissioner Brunsdale observed that, the domestic plate market was not so price sensitive that small amounts of imports such as those the majority found to be negligible, and those of Poland and Romania which she, individually, found to be negligible, could result in price suppression or depression. (*See* Additional and Dissenting Views of Commissioner Brunsdale at *314, 317*).

■ Stalexport's objection to Commissioner Nuzum's consideration of Poland's dumping margin is also not compelling. Although Commerce revoked Poland's nonmarket economy status retroactively to January 1, 1992, that decision was made on June 21, 1993. This was relatively late in the process as Commerce's POI covered January 1 through June 30, 1992. Further, Commerce conveyed its intent to conduct a changed circumstance review for Poland. *See Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate From Poland,* 58 Fed. Reg. at 37,205 (1993). At oral argument, counsel for the ITC advised the Court that a Commerce changed circumstance review was terminated because the Polish producers proved uncooperative. Confidential Tr. of Oral Argument at 49 (Oct. 19, 1994). In fact, Commerce stated:

> On August 13, 1993, we initiated a changed circumstances review (58 FR 44166, August 19, 1993) to provide Huta Czestochowa (Czestochowa), the sole respondent, the opportunity to have a new duty deposit rate calculated using a market economy analysis of sales made during the same period examined in the investigation (January 1 through June 30, 1992). Czestochowa did not respond to the Department's questionnaire despite numerous extensions of time granted by the Department. Moreover, on November 30, 1993, Czestochowa requested termination of this review. Therefore, we have decided to terminate this review.

*Notice of Termination of Changed Circumstances Review: Certain Cut-to-Length Carbon Steel Plate From Poland,* 58 Fed.Reg. 65,964 (1993). Therefore, the assigned rate of 61.98% remained effective. The Court observes that Commerce possesses exclusive responsibility for LTFV determinations. *See Algoma Steel Corp. v. United States,* 12 CIT 518, 688 F.Supp. 639 (1988), *aff'd,* 865 F.2d 240 (Fed.Cir.), *cert. denied,* 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 590 (1989). Dumping margins which may result from Commerce findings may be relied upon by Commissioners unless the margin determinations are judicially found unsound. Stalexport has not shown that the court has rejected the dumping margin at issue.

Moreover, in addition to considering Poland's final anti-dumping duty margin, Commissioner Nuzum clearly assessed various factors in reaching her conclusion regarding Polish plate imports. *Final Determination* (Additional and Dissenting Views of Commissioner Nuzum) at 371. Commissioner Nuzum noted in her cumulation discussion that, in 1992, Polish plate imports were valued at $7 million and their market penetration was 0.5% of U.S. consumption. Polish plate entered the U.S. in twenty-five out of thirty-six months, through six importers in 1992, and were distributed in three of the four regions. Further, Commissioner Nuzum considered that in twenty-one price comparisons, there were seven instances of underselling and there were three confirmed instances of lost sales or lost revenues. She noted as well that the unit value of Polish plate decreased over the period and remained below the average unit value of total subject imports. Commissioner Nuzum concluded that, based on the significant presence of Polish plate and their significant degree of competition with domestic and other imported products, Polish plate imports were not negligible. *Id.* Therefore, Stalexport does not succeed on this point.

Finally, Stalexport does not persuade the Court that difficulties related to Polish imports render them harmless. Regardless of any delivery delays, because of Poland's prepayment policy, the domestic industry is injured as soon as domestic plate purchasers negotiate contracts with Polish steel mills. In addition, fast delivery was not one of the most critical concerns for domestic plate purchasers. Domestic purchasers also did not convey dissatisfaction with the quality of Polish plate. *Staff Report* at I-157, I-163.

In sum, the Commission's decision to cumulate plate imports from Poland was supported by substantial evidence and was in accordance with law.

**FINLAND**

In its final determination, the Commission found that Finnish imports were not negligible and warranted cumulation.

Rautaruukki contends that Finnish plate imports should not have been cumulated as they were *de minimis*. *Brief in Support of Rule 56.2 Motion of Plaintiff Rautaruukki Oy for Judgment on Agency Record* ("*Rautaruukki's Brief*") at 8. Specifically, Rautaruukki argues that only 186,000 tons of Finnish plate entered the domestic market during the POI as compared to the 15 million tons of domestic purchases of plate overall. Rautaruukki also argues that the *de minimis* volume and share of apparent domestic consumption of Finnish plate imports declined yearly during the POI. *Rautaruukki's Brief* at 9–11.

Rautaruukki maintains that the ITC has previously recognized that countries exporting a quantity of an investigated product that accounts for less than 1% of domestic consumption should qualify for the negligible imports exception. *Id.* at 10. Rautaruukki alleges that, in the instant case, the Commission has applied the negligible imports exception in an overly restrictive manner. Respondent urges the Court to instruct the Commission to apply the negligibility exception when a country's imports are *de minimis*, instead of requiring that they be "extremely" *de minimis*. *Id.*

The Commission argues that, in terms of volume, Finland was the sixth largest exporter of plate to the U.S. during the POI and Finnish plate held a larger share of the domestic market than that of seven other countries shipping plate to the United States. *ITC's Brief* at 58.

■ The Court finds that the Commission properly cumulated Finnish plate imports for the purpose of determining material injury. The court recognized in *U.S. Steel Group v. United States*, 18 CIT ——, ——, 873 F.Supp. 673, 692–93 (1994), *appeal docketed*, No. 95–1245 (Fed.Cir. Mar. 22, 1995), that *Torrington Co.*, 16 CIT at 229, 790 F.Supp. at 1171, held that the absolute volume of imports does not have independent significance for negligibility purposes. The negligibility exception's legislative history confirms this position. *See, supra*, at 32–33. Therefore, the Court declines Rautaruukki's invitation to instruct the Commission to relax its application of the negligible imports exception.

Finnish plate's market share of apparent domestic consumption decreased from 1.5% in 1990 to 1.2% in 1991, and ultimately to 0.9% in 1992. *Staff Report* at I–142, table 101. The volume of Finnish plate imports similarly declined. *Id.* at I–133, table 93. While declining trends are important, in accordance with 19 U.S.C. § 1677(7)(C)(v), the Commission assessed several factors in reaching its decision. Finnish plate imports were not insubstantial; they totaled 83,287 tons in 1990, 55,648 tons in 1991, and 46,975 tons in 1992. *Id.* In addition, Finnish plate sales were not isolated or sporadic as they were sold through twelve importers during thirty-four of the thirty-six POI months in three out of four of the U.S. regions evaluated. *Final Determination* at 225. Furthermore, the majority of Finnish imports were commercial grade plate, Finland sold all four commercial grade products in the Commission pricing series, and the domestic industry produced all of the Finnish niche products. *Id.* at 225. Therefore, Finnish plate was substitutable with domestic plate. With respect to price effects, Finnish plate imports undersold the domestic plate product with margins ranging from 1.1% to 33.0%. *Staff Report* at I–172–75, tables 110–13. One purchaser found Finnish plate superior to domestic plate and two found it comparable. *Id.* at I–163, table 109. Finally, the Commission considered the statutory factor of price sensitivity in its assessment. *Final Determination* at 226. This record evidence properly precluded application of the negligibility exception to Finnish plate.

Therefore, the Commission's decision that Finnish plate imports were not negligible and had a discernible adverse impact on the domestic plate market is supported by substantial evidence and is in accordance with law. Accordingly, the Court sustains the Commission's decision to cumulate plate imports from Finland which had been found to satisfy the competition requirement.

## ROMANIA

Respondent Metalexportimport advances several arguments in opposition to the Commission's cumulation of Romanian plate im-

ports. First, Metalexportimport argues that its 0.4% market share in 1992 was well within the range of imports considered negligible in the companion investigations involving hot-rolled steel, cold-rolled steel and corrosion-resistant steel. *Memorandum in Support of the Motion of Metalexportimport S.A. for Judgment on the Agency Record ("Metalex-portimport's Brief")* at 6.

Metalexportimport asserts that the Commission's findings with respect to other products and countries in the companion investigations is probative of what is reasonable in assessing whether Romanian imports were negligible. Metalexportimport argues that the Commission's finding with respect to Romania is inconsistent with its findings regarding other products in these investigations which were found to be negligible. *Reply Memorandum in Support of the Motion of Metalexportimport S.A. for Judgment on the Agency Record* at 7. For example, Metalexportimport contends that the Commission found that corrosion-resistant products from Mexico were negligible although their market share was 0.9% and their value was $108 million in 1992. *Metalexportimport's Brief* at 6.

Metalexportimport also maintains that Romanian plate imports were more isolated and sporadic than the imports of numerous products from other countries which the Commission found to be negligible in these investigations. *Id.* at 6–7, 10. Metalexportimport contends that, in deference to these facts, the Commission's finding regarding Romanian imports was based solely on evidence of underselling in a price sensitive market. *Id.* at 7.

Metalexportimport also argues that evidence of underselling by Romanian imports was attributable to differences in price due to the inferior quality of Romanian plate. *Id.* at 13, 16. Further, Metalexportimport maintains that cold-rolled steel imports from Italy and Spain and plate from Italy and France consistently undersold domestic plate, but were found to be negligible. *Id.* at 7. Metalexportimport contends, therefore, that the issue of price sensitivity must have been central to the Commission's finding. *Id.*

Metalexportimport further argues that Commissioner Watson's determination was flawed because of an alleged inconsistency in his findings. Essentially, Metalexportimport questions how Commissioner Watson could find that Romanian plate imports were not negligible and had a discernible adverse impact on the domestic market based on the domestic market's price sensitivity—when he concurred with Commissioner Crawford that the domestic market was not price sensitive. *Id.* at 4–8.

Lastly, Metalexportimport argues that, at best, Romanian plate was only marginally substitutable with domestic products and was not more substitutable than other products found to be negligible in the companion investigations. *Id.* at 12–13.

In assessing the effects of various subsidized or dumped foreign products, divergent determinations on negligibility may result although there may be factual similarities regarding dissimilar industries.

In these investigations, the Commission found a single like product consisting of cut-to-length steel plate. *Final Determination* at 213–16. Metalexportimport has not contested the finding that cut-to-length steel plate is a separate like product. The Commission also found that there is one domestic industry consisting of all domestic producers of cut-to-length carbon steel plate. *See Id.* at 216. The Commission is required to assess the effects of subsidized or dumped imports in relation to the United States production of the like product within that industry. 19 U.S.C. § 1677(4)(D). Hence, the Commission assesses foreign subsidized or dumped products on their own merit, on a case by case basis. H.R.Rep. No. 317, 96th Cong., 1st Sess. 46 (1979); S.Rep. No. 249, 96th Cong., 1st Sess. 88 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 474. Therefore, although the Commission's findings with respect to hot-rolled, cold-rolled, and corrosion-resistant steel may have some probative value, they do not dictate similar conclusions with respect to cut-to-length steel plate. *See, e.g., Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1209, 704 F.Supp. 1075, 1087–88 (1988); *Alberta Pork Producers' Mktg. Bd. v. United States,* 11 CIT 563, 587, 669 F.Supp. 445, 464

(1987). *See also Maine Potato Council v. United States,* 9 CIT 293, 300 n. 7, 613 F.Supp. 1237, 1244 n. 7 (1985). Hence, the Court is not swayed by Metalexportimport's arguments which compare and contrast the finding on Romania with the Commission's findings concerning other products from other countries. Also, it is noteworthy that, in absolute terms and as a percentage of apparent consumption, French and Korean plate imports were consistently smaller than those of Romania. *Staff Report* at I–133, table 93; I–142, table 101.

■ In addition, the negligibility exception requires that the Commission evaluate various relevant economic factors specific to the foreign imports. *See* 19 U.S.C. § 1677(7)(C)(v). No single factor is determinative of negligibility. Particular numerical levels, for example, are not dispositive. *See* H.R.Rep. No. 40 at 131. In this regard, Metalexportimport's contention that the Commission relied solely on evidence of underselling and that price sensitivity was pivotal to the Commission's decision is incorrect. It is clear that the Commission took various factors into consideration. Record evidence demonstrated that Romania's share of apparent domestic consumption during the POI increased from 0.6% in 1990 to 0.8% in 1991 and then declined to 0.4% in 1992. *Staff Report* at I–142, table 101. In terms of absolute volume, Romanian plate imports increased from 31,650 tons in 1990 to 36,428 tons in 1991, before decreasing to 18,078 tons valued at under $7 million in 1992. *Id.* at I–133, table 93. Monthly import data indicated that Romanian plate sales were not isolated and sporadic but were made during thirty-two months of the thirty-six months of the POI, through at least two importers in 1992, in two of the U.S. regions evaluated. *Final Determination* at 232. Romanian and domestic plate were both sold in commercial grade products one and four in the Commission's pricing series. *Id.* In addition, in all cases but one, Romanian plate undersold domestic plate by margins ranging from 1.9% to 47.5%. *Staff Report* at I–172–75, tables 110–13. The Commission also considered that one purchaser deemed Romanian plate

inferior to domestic plate because of its shape and lamination, and that Romania's 5–6 month lead time between order and delivery was the longest of any of the countries investigated. *Final Determination* at 232–33. Finally, in reaching its decision, the Commission also considered the statutory factor of price sensitivity. *See id.* at 233. Therefore, Metalexportimport is unpersuasive on this point.

Further, Metalexportimport's contention that underselling was related to the inferior quality of its plate overlooks the fact that the Commission found that Romania sold commercial grade products into the U.S. market that directly competed with similar domestic products. *Id.* at 232. In addition, the average unit values for Romanian plate fell close to the unit values for Mexican, Canadian and Korean plate. Therefore, the quality of Romanian plate is at least of a level which can demand a price similar to that of plate from other countries which purchasers did not consider to be of secondary quality. *Compare Staff Report* at I–134, table 93 and I–163, table 109.

Lastly, Metalexportimport's arguments concerning Commissioner Watson's individual findings on price sensitivity are unavailing for the reasons discussed, *supra,* at 31–32. In addition, Romania exerted discernible price and volume effects constituting adverse impact on the domestic industry and the substitutability of Romanian imports with domestic plate made the domestic industry vulnerable to such effects. *Cf. R–M Indus., Inc. v. United States,* 18 CIT ——, ——, 848 F.Supp. 204, 211 (1994).

Therefore, the Court affirms the Commission's decision to cumulate plate imports from Romania in its material injury analysis.

### FRANCE and KOREA

The Commission found that plate imports from France, Korea and Italy were eligible for exclusion from mandatory cumulation under the statute's negligible imports exception and, individually, were not causing material injury to the domestic plate industry. *Final Determination* at 227, 230.[24]

---

**24.** The Commissioners made their negative material injury determination for Korea by a 6–0 vote

Raising several complaints, petitioners assert that the negligible imports exception is not applicable to France and Korea. First, faulting the Commission for allegedly relying almost exclusively on volume and market share, petitioners argue that the plain language of the negligible imports exception requires that imports be *both* negligible and have no discernible adverse impact on the domestic industry. *Memorandum in Support of Plaintiffs' Motion for Judgment on the Agency Record ("Petitioners' Brief")* at 9–17. Petitioners argue that the volume of French and Korean plate imports was not negligible and, irrespective of their small U.S. market share, had an adverse impact on the domestic industry. *Petitioners' Brief* at 2, 11. Relying on legislative history, petitioners construe the exception as applying only where it is clear that there is no possibility of *any* injurious impact. *Id.* at 12–16.

Petitioners also maintain that Commissioners Newquist, Nuzum and Rohr disregarded their individual findings of price sensitivity and Commissioners Watson's, Crawford's and Brunsdale's findings of limited price sensitivity improperly depart, without explanation, from the Commission's early to mid-1980's findings that the plate market is price sensitive. *Id.* at 16–21 (referring to the rule that "an agency must either conform itself to its prior decisions or explain the reasons for its departure" from *Citrosuco Paulista, S.A.,* 12 CIT at 1209, 704 F.Supp. at 1088).

In addition, petitioners contend that the record lacks evidence of discernible adverse impact because the domestic industry's lost sales and lost revenue allegations did not receive full and adequate consideration. Specifically, petitioners argue that the Staff Report[25] upon which the Commission relied was unamended and under-reported confirmed allegations for France and Korea. *Petitioners' Brief* at 22. Petitioners claim that superseding customer letters confirmed [ ] lost revenue allegations regarding Korea and [ ] lost revenue allegations concerning France. *Id.* at 22–28. Petitioners also con-

tend that the Commission's staff improperly rejected allegations which, although incomplete, adequately conveyed injury. *Id.* at 28–32. With respect to allegations containing complete information, petitioners claim that the Commission's staff only investigated [ ] out of [ ] France-related lost sales or lost revenue allegations and [ ] out of [ ] Korea-related lost sales or lost revenue allegations. *Id.* at 32–33. Petitioners rely on *USX Corp. v. United States,* 11 CIT 82, 87, 655 F.Supp. 487, 492 (1987), in support of a remand for failure to properly investigate allegations. *Petitioners' Brief* at 35–36.

Regarding France, petitioners also contend that the Commission's finding of attenuated competition was incorrect and erroneously led to a finding of no discernible adverse impact. Petitioners maintain that the Commission's finding is contradicted by evidence showing that (1) French plate was present in all four U.S. geographic regions and was sold during all thirty-six months of the POI; (2) four domestic purchasers reported that French plate was comparable to domestic plate; and (3) a full [ ]% of the Commission's pricing comparisons by tonnage showed that French plate undersold domestic plate. *Id.* 38–40.

With respect to Korea, petitioners also argue that the Commission improperly relied on evidence of predominant overselling as only [ ]%, or [ ] tons, of all Korean plate imports were investigated. *Id.* at 40.

Lastly, petitioners argue that the Commission should have cumulated French and German plate imports because of the cross-ownership and marketing ties between French plate manufacturer Usinor Sacilor ("Usinor") and related German plate producer AG der Dillinger Huttenwerke ("Dillinger"). According to petitioners, Usinor and Dillinger have the capacity and the incentive to reallocate export shipments from Germany to France in order to avoid the 49.9% combined dumping and countervailing duties which apply to German plate imports. In support, petitioners argue that: (1) Usinor owns 70%

and for France by a 5–1 vote, with Commissioner Nuzum voting in the affirmative. The Italy negative determination is not at issue in this appeal.

25. The Commission's determination noted one lost sale due to Korean plate imports. *See Final Determination* at 230, citing to *Staff Report* at I–180, table 117.

of Dillinger's parent, German holding company Dillinger Hyutte Saarstahl AG, which has a 95.22% interest in Dillinger; (2) Usinor markets plate through GTS, its wholly-owned French subsidiary; GTS and Dillinger participate, as members of Usinor's "Flat Products Division," in a common marketing strategy for plate, devised by Usinor; (3) Usinor and Dillinger use the same U.S. importer and selling agent to market their plate products; (4) Dillinger owns a 100% stock interest in a Florida pipe producer to which Dillinger and Usinor export; and (5) France and German plate imports serve the same niche markets. *Id.* at 41–48.

Petitioners incorrectly contend that any evidence of adverse impact makes imports ineligible for the negligible imports exception. Such a strict interpretation of the negligibility exception would render it meaningless and would unfairly include imports in an affirmative injury finding by virtue of consolidation with the substantial imports of other plate producing countries.

■ The court has stated that the "determination of no adverse impact is a multifaceted one, and the court will not construct a *per se* rule." *Kern–Liebers USA, Inc. v. United States,* 19 CIT ——, ——, Slip Op. 95–9 at 19, 1995 WL 33066 (Jan. 27, 1995) (quoting *U.S. Steel Group,* 18 CIT at ——, 873 F.Supp. at 692, *appeal docketed,* No. 95–1257 (Fed.Cir. Mar. 27, 1995). Rather, in assessing whether imports are negligible and have no discernible adverse impact, the statute requires the Commission to weigh a number of factors, in addition to volume and market share, including trends in imports such as price declines, evidence of underselling, substitutability, the price sensitivity of the domestic market, and whether imports are isolated and sporadic. 19 U.S.C. § 1677(7)(C)(v).

The Commission's France and Korea determinations clearly did not rely almost exclusively on import volume[26] and market share while, otherwise, largely ignoring the factor of discernible adverse impact. Although the volume and market share of French and Korean imports were important indicators, the record also shows that, during the POI, the domestic industry supplied in excess of 84% of apparent domestic consumption of plate. *See Staff Report* at I–142, table 101. Total imports found to be negligible accounted for only 0.4% of the plate market in 1992, as compared to a 14% share by cumulated imports. *Id.*

■ France's particular share of apparent domestic consumption increased slightly from 0.2% in 1990, before declining to 0.1% in 1992. *Id.* Absolute volume of French plate imports decreased to 6,652 tons in 1992, a quantity lower than the 1990 level. *Id.* at I–133, table 93. French plate was only moderately substitutable with domestic plate and there was some evidence of overselling,[27] with respect to at least some of the French imports. *Final Determination* at 227. The Commission concluded that evidence of mixed over- and underselling suggested some attenuated competition. *Id.* The mixed pricing evidence suggests that there was less of an adverse impact. However, the Commission placed less emphasis on pricing where volume of imports was very low,[28] as is the case here. *Id.* at 31–32. Therefore, attenuated competition was not a significant basis for the Commission's France negligibility finding. Further, where there were low volumes, the Commission has generally found imports to be negligible even in a more price sensitive market, and even when there was some evidence of underselling.[29] *Id.*

In addition, the Commission examined the statutory factor of "isolated and sporadic" sales, examining months present, geographic location, and number of importers/consignees

**26.** In absolute volume, French and Korean plate imports totaled 31,225 and 45,707 tons, respectively, during the POI. *See Staff Report* at I–133, table 93.

**27.** Commissioner Rohr did not find the degree of the price differences significant and did not rely on this factor in deciding that French imports

were negligible. *Final Determination* at 227 n. 134.

**28.** Commissioner Nuzum did not join in this statement. *Id.* at 32 n. 157.

**29.** Statement not applicable to Commissioner Nuzum. *Id.*

handling the imports. *Final Determination* at 227. Although French plate imports were sold in the four regions of the United States during thirty-six months of the POI, *see id.*, imports which are not isolated and sporadic, in appropriate circumstances, may still be negligible. *Torrington Co.*, 16 CIT at 229, 790 F.Supp. at 1171. To conclude otherwise could lead to the absurd result that a regular import flow of a small number of plate products per month would preclude a negligibility finding. *See* H.R.Rep. No. 40 at 131 (cumulation provision not intended to lead to ridiculous results). The determination at issue was reached mindful of legislative history's direction that the negligibility exception "be applied with 'particular care in situations involving fungible products, where a small quantity of low-priced imports can have a very real effect on the market.'" *See Final Determination* at 29 (quoting H.R.Rep. No. 40 at 130; citing H.R.Conf.Rep. No. 576, 100th Cong., 2d Sess. 621 (1988)).[30] However, the Commission is guided to assess negligibility in a manner that makes sense in light of the "realities of the marketplace." H.R.Rep. No. 40 at 131.

In addition, the Commissioners' negative findings on price sensitivity were clearly explained.[31] For example, Commissioner Crawford noted that she had evaluated:

(1) the overall sensitivity of demand to changes in the price of the product (the elasticity of demand), (2) the responsiveness of domestic supply to changes in market price (the elasticity of supply), (3) the availability of nonsubject imports, and (4) the aggregate substitutability of the subject imports for the domestic like product (the elasticity of substitution between subject imports and the domestic like product).

*Final Determination* (Additional and Dissenting Views of Commissioner Crawford) at 337. Discussing each factor in turn, Commissioner Crawford explained that, while the low elasticity of demand for plate might result in price sensitivity if the subject imports were fungible with the domestic like product and the domestic industry was operating at full capacity, the imports have a low or moderate substitutability with the like product and the domestic industry possesses substantial unused capacity. *Id.* at 337–42. Commissioner Brunsdale also detailed that she had considered the substitutability of imports, the elasticity of demand, the price responsiveness of domestic supply, and underselling. *See Id.* (Additional Views of Commissioner Brunsdale) at 314–15. Therefore, it is apparent to the Court that the Commissioners explained their findings regarding price sensitivity.

Furthermore, a differing finding on price sensitivity from that reached in previous determinations is not a basis for remand. The court has long recognized that "each injury investigation is *sui generis*, involving a unique combination and interaction of many economic variables; and consequently, a particular circumstance in a prior injury investigation cannot be regarded by the Commission as dispositive of the determination in a later investigation." *U.S. Steel Group*, 18 CIT at ——, 873 F.Supp. at 695 (quoting *Connecticut Steel Corp. v. United States*, 852 F.Supp. 1061, 1066 (1994) (citation omitted); *Citrosuco Paulista S.A.*, 12 CIT at 1209, 704 F.Supp. at 1087 (quoting *Armstrong Bros. Tool Co. v. United States*, 84 Cust.Ct. 102, 115, C.D. 4848, 489 F.Supp. 269, 279 (1980)). *See also Torrington Co.*, 16 CIT at 226, 790 F.Supp. at 1170. Therefore, the Commission was not bound by its price sensitivity findings in previous steel cases. However, the Commission may not act arbitrarily. *See Kern–Liebers USA, Inc.*, 19 CIT at ——, Slip Op. 95–9 at 25, 1995 WL 33066. *See also Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974) (agency must articulate rational connection between facts found and conclusion reached).

Here, the Commission was presented with a unique set of facts. Although the Court

---

**30.** The Commission found that the domestic plate market was price sensitive. *See id.* at 238. *See also supra* at 31 n. 23 (Commissioners' individual findings regarding the market's price sensitivity).

**31.** *See supra* at 31 n. 23 noting Commissioner Watson's concurrence with Commissioner Crawford.

believes that the Commission provided adequate explanation, the Commission is not obliged to explain in any particular manner the change in its views on price sensitivity. *U.S. Steel Group*, 18 CIT at ——, 873 F.Supp. at 695; *see also Allied–Signal Aerospace Co. v. United States*, 28 F.3d 1188, 1191 (Fed.Cir.1994) (upholding Commerce's selection of "all others" rate under second tier of new best information available methodology without explanation for departure from prior methodology, on basis that methodology was not analogous to regulation having force and effect of law), *cert. denied*, —— U.S. ——, 115 S.Ct. 722, 130 L.Ed.2d 628 (1995). Therefore, petitioners' argument on this point fails.

In addition, the cross-ownership and marketing ties between French producer Usinor and German producer Dillinger did not compel cumulation of French imports. The Commission concluded that the record lacked evidence supporting petitioners' contention that the multinational operations of Usinor and Dillinger would circumvent the antidumping order on German plate products by diverting shipments to minimize potential duties. *Final Determination* at 227. Petitioners have not pointed to any concrete evidence to support their theory that product shifting had an adverse impact in this case. Therefore, in light of the low volume and market share of French imports, the Commission's decision not to cumulate on this basis was reasonable. The Commission has the discretion to make a reasonable interpretation of the facts, *see National Ass'n of Mirror Mfrs. v. United States*, 12 CIT 771, 778, 696 F.Supp. 642, 647 (1988), and the Court will not decide whether it would have made the same decision on the basis of the evidence. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed.Cir. 1984). Moreover, the court has previously affirmed the Commission's decision not to cumulate based on the conclusion that the affiliated companies' import practices indicated that they did not import principally to benefit from unfair trade practices. *Torrington Co.*, 16 CIT at 230, 790 F.Supp. at 1172.

The Court also observes that petitioners' concerns on this matter relate more to threat of material injury and not to actual adverse impact on the domestic industry. Threat does not require mandatory cumulation. 19 U.S.C. § 1677(7)(F)(iv). *See Asociacion Colombiana de Exportadores de Flores*, 12 CIT at 1174, 704 F.Supp. at 1068. Moreover, the court has held that a finding of threat of material injury and product shifting may not be based on conjecture or speculation. *Alberta Gas Chems. v. United States*, 1 CIT 312, 321–25, 515 F.Supp. 780, 789–91 (1981). Accordingly, the Commission reasonably declined to cumulate French plate imports on the basis of cross-ownership.

Regarding Korea, imports during the POI decreased in volume steadily each year, from 21,361 tons in 1990 to 15,186 tons in 1991, and ultimately to 9,160 tons in 1992. *Staff Report* at I–133, table 93. Korean plate's small share of apparent domestic consumption exhibited a parallel decline to 0.2% in 1992. *Id.* at I–142, table 101. In terms of value, Korean imports amounted to little more than $3 million in a market comprised of $1,952 million in value in 1992. *Id.* at I–39, table 10 and I–133, table 93.

In addition, Korean plate sales were somewhat geographically isolated, concentrated in only two of the four regions of the United States and were made though three importers/consignees in 1992. *Final Determination* at 230. Further, pricing data for Korean plate evidenced a pattern of predominant overselling with margins ranging from 2.9% to 39.4%.[32] *Id.* There were thirteen instances of overselling and three instances of underselling. *Final Determination* (citing *Staff Report* at I–174, table 112 and I–175, table 113). The Commission concluded that evidence of overselling suggested an absence of adverse impact on the domestic industry and somewhat attenuated competition. *Id.* at 230. Most Korean plate imports appeared to be only moderately substitutable with commercial quality domestic plate products. *Id.*

---

**32.** Commissioner Watson also considered high average unit value as supporting overselling

data. *Final Determination* at 31 n. 154.

Further, the Court disagrees with petitioners that the Commission's determination is unsupported by substantial evidence because the pricing data utilized in its predominant overselling finding represented an insufficiently low percentage of total Korean plate imports. Petitioners do not allege or point to any evidence showing that the pricing data utilized was inaccurate or unrepresentative of total imports. Moreover, the statute does not require that the Commission assess the price-depressing effects of imports in any particular manner. *Cemex, S.A. v. United States,* 16 CIT 251, 261, 790 F.Supp. 290, 299 (1992), *aff'd without op.,* 989 F.2d 1202 (Fed. Cir.1993). In its analyses, the Commission has discretion to reasonably interpret evidence and determine the overall significance of any factor. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 88 (1979) ("the significance to be assigned to a particular factor is for the ITC to decide"), *reprinted in* 1979 U.S.C.C.A.N. 381, 474; H.R.Rep. No. 317, 96th Cong., 1st Sess. 46 (1979) (the "significance of the various factors ... will depend upon the facts of each particular case"); *see also Trent Tube Div., Crucible Materials Corp. v. United States,* 14 CIT 386, 403, 741 F.Supp. 921, 935 (1990), *aff'd,* 975 F.2d 807 (Fed.Cir.1992). The Court observes that "Congress set no minimum standard by which to measure the thoroughness of a Commission investigation." *Granges Metallverken AB,* 13 CIT at 481, 716 F.Supp. at 25 (Commission's investigation found thorough although pricing data covered only eight out of possible 126 quarters). Therefore, petitioners' argument regarding the Commission's analysis of price data for Korea does not prevail.

Regarding the Commission's handling of lost sales and revenue allegations [33], petitioners' reliance on *USX Corp.,* 11 CIT at 87, 655 F.Supp. at 492, in favor of a remand is misplaced as that case is inapposite. In *USX,* the court directed the Commission to undertake a more thorough investigation because the Commission had failed to investigate four of seven lost sales allegations and all three reported instances of lost revenue,

and had relied exclusively on the absence of confirmed allegations to find no significant adverse price effects. *USX Corp.,* 11 CIT at 86, 655 F.Supp. at 491. It was the Commission's sole reliance on the absence of confirmed allegations "[i]n the face of steadily rising import volume and proven margins of underselling" that rendered the Commission's determination unsupported by substantial evidence without further investigation. *Id.* at 86, 655 F.Supp. at 491. In distinct contrast, in the instant case, the Commission's findings regarding France and Korea rested solidly on an assessment of various factors. *See Final Determination* at 226–27, 229–30.

Further, the Staff Report is not devoid of evidence concerning the allegedly unreported allegations. *See Staff Report* at I–180 n. 232 (confirmed via form letters: seven allegations concerning 1,175 tons and $98,290 for France; eight allegations concerning 2,020 tons and $187,150 for Korea); *see also Final Determination* (Additional and Dissenting Views of Commissioner Nuzum) at 369–70 (referencing seven instances of France-related lost revenue allegations confirmed by letters solicited by a petitioner and nine confirmed Korea-related lost revenues, including eight confirmed by letters solicited by a petitioner). Therefore, the Court will not infer that the full Commission did not consider all properly confirmed allegations. *See, e.g., Trent Tube Div. Crucible Materials Corp.,* 14 CIT at 395, 741 F.Supp. at 929–30 ("absent a showing to the contrary, the Commission is presumed to have considered all the evidence of record").

On April 30, 1993, after an initial submittance of a large number of lost sales and revenue allegations, the Commission's staff met with petitioners' counsel and pointed out deficiencies in specific allegations. Petitioners subsequently responded with additional information but were unable to fill in all gaps. AR (Conf.) List 2, Doc. 301H (May 12, 1993 letter from petitioners). Therefore, the Commission's staff endeavored to assist

---

**33.** The allegations specific to France and Korea involved only lost revenues. *See Staff Report* at I–180 n. 228.

petitioners in creating an adequate record. Further, in challenges to the Commission's investigative thoroughness, remands are appropriate only for failure to seek necessary information. *See Atlantic Sugar Ltd. v. United States,* 744 F.2d 1556, 1561 (Fed.Cir. 1984).

■ Although evidence of lost sales and revenue may be probative, the lack of such evidence will not vitiate a Commission determination. *Metallverken Nederland B.V.,* 13 CIT at 1025, 728 F.Supp. at 739 (citing to *USX Corp.,* 11 CIT at 82, 655 F.Supp. at 491). *See also Negev Phosphates, Ltd. v. United States,* 12 CIT 1074, 1092, 699 F.Supp. 938, 953 (1988) (holding that the ITC is not required to, but may, incorporate lost sales allegations in analysis of lost sales). While the Commission's approach in the instant case may not have yielded as many confirmed allegations relating to France and Korea as petitioners would like, the court has noted that the ITC is not statutorily required to use a particular methodology to review lost sales (or in this case, lost revenue). *Copperweld Corp. v. United States,* 12 CIT 148, 169–70, 682 F.Supp. 552, 572 (1988); *Maine Potato Council,* 9 CIT at 302, 613 F.Supp. at 1245. The Commission has discretion to pursue investigations in a manner which will yield substantial evidence to support its determinations. *Granges Metallverken AB,* 13 CIT at 481, 716 F.Supp. at 25.

■ Further, the reasonableness of the Commission's investigations must be judged in light of the short statutory constraints imposed upon the Commission's staff and the problematic nature of obtaining information. *Hannibal Indus., Inc. v. United States,* 13 CIT 202, 208, 710 F.Supp. 332, 337 (1989). Moreover, petitioners' contention that the Commission could have pursued more allegations is irrelevant. The question is not whether the Commission might have obtained additional information, but whether its determinations are supported by substantial evidence and are in accordance with law. *Id.* at 208, 710 F.Supp. at 337 (citing *Atlantic Sugar, Ltd.,* 744 F.2d at 1561). Accordingly, the Court finds that the Commission's handling of lost revenue allegations regarding France and Korea also does not warrant a remand.

Therefore, the Commission's decision to exclude France and Korea from mandatory cumulation was in accordance with law and supported by substantial evidence.

### CONCLUSION

The Court finds that, in every case, respondents' and petitioners' challenges are unavailing.

South African plate imports satisfied the statutory requirements for cumulation. As Charleroi raises no arguments particular to Belgium, the Court sustains the Commission's cumulation of Belgian plate imports in its material injury analysis as supported by substantial evidence and in accordance with law. Likewise, the Court sustains the Commission's inclusion of plate imports from Poland, Finland and Romania and its exclusion of plate from France and Korea in its cumulated present material injury analysis as supported by substantial evidence and in accordance with law.

### JUDGMENT

This case having been submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that respondents' motions for judgment upon the agency record are denied in all respects and the final affirmative material injury determinations of the International Trade Commission (the "Commission") concerning cut-to-length carbon steel plate ("plate") imports from Belgium, Poland, Finland and Romania as set forth in *Certain Flat–Rolled Carbon Steel Products From Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, New Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom* ("*Certain Flat–Rolled Carbon Steel Products From Argentina, et al.*"), USITC Pub. No. 2664 at 211, Inv. Nos. 701–TA–319–332, 334, 336–342, 344 and 347–353 and Inv. Nos. 731–TA–573–579, 581–592, 594–597, 599–609 and 612–619 (Aug. 1993) (final determ.); 58 Fed.Reg. 43,-905 (1993), are sustained; and it is further

**ORDERED** that petitioners' motion for judgment upon the agency record is denied and the Commission's final negative determinations concerning plate imports from France and Korea as set forth in *Certain Flat–Rolled Carbon Steel Products From Argentina, et al.,* USITC Pub. No. 2664 at 211, Inv. Nos. 701–TA–319–332, 334, 336–342, 344 and 347–353 and Inv. Nos. 731–TA–573–579, 581–592, 594–597, 599–609 and 612–619 (Aug. 1993) (final determ.); 58 Fed.Reg. 43,905 (1993), are likewise sustained; and it is further

ORDERED that this consolidated action is dismissed.