**Slip Op. 07-33**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                          :
COMMITTEE FOR FAIR BEAM IMPORTS,          :
                                          :
              Plaintiff,                  :
                                          :
              v.                          :
                                          :  Court No.
UNITED STATES,                            :  06-00125
                                          :
              Defendant,                  :
                                          :
              and                         :
                                          :
HYUNDAI STEEL COMPANY,                    :
                                          :
              Defendant-Intervenor.       :
_____:

**Held**: Plaintiff's motion for judgment upon the agency record denied. The United States International Trade Commission's final determination affirmed.

Wiley Rein & Fielding, LLP, (Alan H. Price; John R. Shane; Michael William Schisa; Christopher B. Weld) for Plaintiff, Committee for Fair Beam Imports.

Marc A. Bernstein, Office of the General Counsel, James M. Lyons, General Counsel, Neal J. Reynolds, Assistant General Counsel, Office of the General Counsel, U.S. International Trade Commission for Defendant, United States.

Kaye Scholer, LLP, (Donald B. Cameron; Julie C. Mendoza; Brady W. Mills; Jahna M. Hartwig) for Defendant-Intervenor, Hyundai Steel Company.

March 8, 2007

**OPINION**

This matter is before the Court on motion for judgment upon the agency record brought by the Committee for Fair Beam Imports

and its individual members Chaparral Steel Company, Nucor Corporation, Nucor-Yamato Steel Company and Steel Dynamics, Inc. (collectively "CFBI" or "Plaintiff") pursuant to USCIT Rule 56.2. Plaintiff challenges aspects of the United States International Trade Commission's ("ITC" or "Commission") negative final determination in the five-year sunset reviews concerning structural steel beams from Japan and Korea.  The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (B)(iii) (2000).  For the reasons set forth below, the Court affirms the ITC's determination and dismisses this action.

## BACKGROUND

On May 2, 2005, the ITC instituted five-year sunset reviews[1] of the countervailing duty order on structural steel beams from Korea and the antidumping duty orders on structural steel beams from Japan and Korea (collectively, "the orders").  See Structural

---

[1]    Five-year reviews are also referred to as "sunset reviews":

> 5 years after the date of publication of . . . a countervailing duty order . . . [or] an antidumping duty order . . . the Commission shall conduct a review to determine, in accordance with section 1675a of this title, whether revocation of the countervailing or antidumping duty order . . . would be likely to lead to continuation or recurrence of dumping or a countervailable subsidy . . . and of material injury.

19 U.S.C. § 1675(c)(1).

Steel Beams From Japan and Korea, 70 Fed. Reg. 22,696 (ITC May 2, 2005) (Notice of Institution).    On August 5, 2005 the ITC determined to conduct full reviews of each order.[2]  See Structural Steel Beams From Japan and Korea, 70 Fed. Reg. 48,440 (ITC Aug. 17, 2005) (Notice of Commission determination to conduct full five-year reviews).    It consequently issued questionnaires, permitted interested parties to submit evidence and file briefs, and conducted a hearing, during which all persons who requested the opportunity, were permitted to appear.  See id.; Structural Steel Beams From Japan and Korea, 71 Fed. Reg. 13,431 (ITC Mar. 15, 2006) (Notice).   CFBI submitted data compiled by a commercial service monitoring markets in steel products ("service data").[3]  See Pl.'s

---

[2]     The ITC found that the domestic interested party group response to its notice of institution was adequate and that the respondent interested party group response with respect to Korea was adequate, but found that the respondent interested party group with respect to Japan was inadequate.  This notwithstanding, the ITC determined to conduct a full review concerning subject imports from Japan to promote administrative efficiency in light of its decision to conduct a full review with respect to subject imports from Korea.  See Structural Steel Beams From Japan and Korea, 70 Fed. Reg. 48,440 (ITC Aug. 17, 2005) (Notice of Commission determination to conduct full five-year reviews).

[3]     The name of the commercial monitoring service is subject to judicial protective order.  Plaintiff submitted the data onto the record as exhibits to its briefs, and the parties to the investigation agreed that the data provided useful information concerning certain conditions of competition.  See Def.'s Resp. at 4; Pl.'s Br. at 15.

   Additionally, the Court further omits, and double-brackets the public version, of certain proprietary information also subject to this order.

Br. at 15.  See generally Pet.'s Prehearing Br., C.R. Doc. 116; Pet.'s Posthearing Br., C.R. Doc. 125.[4]  The parties to the investigation concurred that this data was probative of conditions of competition.[5]  See Def.'s Resp. Pl.'s Mot. J. Agency Rec. at 4 ("Def.'s Resp.").

The ITC's final determination was issued on March 9, 2006 and published on March 15, 2006.  See Structural Steel Beams from Japan and Korea, Inv. Nos. 701-TA-401, 731-TA-853-854 (Review) USITC Pub. No. 3840 (March 2006) ("Final Determination") (C.R. Doc. 159); 71 Fed. Reg. at 13,431.  The ITC determined that "revocation of the antidumping duty orders on structural steel beams from Japan and Korea and revocation of the countervailing duty order on structural steel beams from Korea would not be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time."  Final Determination, C.R. Doc. 159 at 1.

Plaintiff disagrees, and argues that the final determination

---

[4]    Citation to the Confidential Record will hereinafter be referred to as "C.R. Doc."

[5]    The commercial monitoring service reported production and consumption of a product similar, but not identical to structural steel beams, called "structural long products."  The parties and the ITC, however, agreed that the structural long products data were a "useful surrogate" for certain conditions of competition.  See Final Determination, C.R. Doc. 159 at 15.

is unsupported by substantial evidence and otherwise contrary to law. See Pl.'s Mem. Supp. R. 56.2 Mot. J. Ag. Rec. at 4 ("Pl.'s Mem."). Specifically, Plaintiff contests the ITC's finding with respect to volume. It insists that the "determination that revocation of the orders would not result in a significant volume of subject imports is unsupported by substantial evidence and otherwise contrary to law" because it was based on what Plaintiff considers to be "erroneous findings."[6] Id. (listing ITC findings including, inter alia, that price disparities do not provide incentive to increase exports to the United States; projections regarding supply and demand in Asia.). Although Plaintiff also contests the determinations regarding likely price effects and impact, it does so only because it contends that, "these determinations were based in large part on the[ITC's] erroneous findings regarding the likely volume of subject imports." Id. at 4–5. As such, CFBI's argument focuses, primarily, on the ITC's findings on the likely volume of subject imports. See generally id. at 11–32.

---

[6]      In its final determination, the ITC made a series of findings in support of its ultimate negative determination. See generally, Final Determination, C.R. Doc. 159. As indicated, Plaintiff takes issue with several of these findings and argues that each is unsupported by substantial evidence and otherwise contrary to law. See generally, Pl.'s Mem. at 11–30. Each finding will be addressed infra, in turn.

**STANDARD OF REVIEW**

When reviewing ITC determinations in sunset reviews "[t]he court shall hold unlawful any determination, finding, or conclusion . . . found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is more than a mere scintilla." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co., 305 U.S. at 229). In determining the existence of substantial evidence, a reviewing court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" Huaiyin, 322 F.3d at 1374 (quoting Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

**DISCUSSION**

**I.   Statutory Framework**

The ITC is instructed by statute to evaluate "the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked . . . ." 19 U.S.C. § 1675a(a)(1). Although the ITC must consider each of these factors, the Court limits its discussion of price effect and impact

because, in the instant matter, Plaintiff primarily contests the

ITC's finding with respect to volume.    Title 19 U.S.C.

§ 1675a(a)(2) governs this finding, and provides:

> In evaluating the likely volume of imports of
> the subject merchandise if the order is
> revoked . . . the Commission shall consider
> whether the likely volume of imports of the
> subject merchandise would be significant if
> the order is revoked . . . either in absolute
> terms or relative to production or consumption
> in the United States.   In so doing, the
> Commission shall consider all relevant
> economic factors, including ("economic
> factors") –
>
>> (A)   any likely increase in
>>        production capacity or existing
>>        unused production capacity in
>>        the exporting country,
>> (B)   existing inventories of the
>>        subject merchandise, or likely
>>        increases in inventories,
>> (C)   the existence of barriers to
>>        the importation of such
>>        merchandise into countries
>>        other than the United States,
>>        and
>> (D)   the potential for product-
>>        shifting if production
>>        facilities in the foreign
>>        country, which can be used to
>>        produce the subject
>>        merchandise, are currently
>>        being used to produce other
>>        products.

§ 1675a(a)(2).


Put simply, the ITC must determine whether, considering the

four economic factors set forth in subsections (A) through (D), it

is "likely" that the volume of imports will be "significant" if the

unfair trade orders are revoked.[7]  Id.  "Thus, in accordance with

the statute, in order to find sufficient volume for there to be

injury, the ITC must identify substantial evidence from the record

demonstrating that, should the orders be revoked, it is likely that

the volume of the subject imports entering the U.S. market will be

significant.[8]"  Nippon Steel Corp. v. United States, 29 CIT __, __,

391 F. Supp. 2d 1258, 1275 (2005) (citing 19 U.S.C. § 1675a(a)(2)).


    Lastly, 19 U.S.C. § 1677(7)(C) provides further guidance in

evaluating volume during a sunset review.[9]  It instructs that in

---

[7]     The ITC must point to substantial evidence indicating
that each of the four economic factors exist with respect to the
subject country.

[8]     This Court has defined the word "significant" as
"having or likely to have influence or effect[;] deserving to be
considered[;] important, weighty, notable[.]" Gerald Metals, Inc.
v. United States, 22 CIT 1009, 1013, 27 F. Supp. 2d 1351, 1355
(1998) (internal citation and quotations omitted) (alteration in
original).

[9]     19 U.S.C. § 1677(7)(C)(i) sets forth that:

    For purposes of subparagraph (B) ['Volume and
    consequent impact'] --

        (i) Volume
        In evaluating the volume of imports
        of merchandise, the [ITC] shall
        consider whether the volume of
        imports of the merchandise, or any
        increase in that volume, either in
        absolute terms or relative to
        production or consumption in the
        United States, is significant.

§ 1677(7)(C)(i).

evaluating the significance of the volume, the ITC must do so in either absolute terms, or relative to production or consumption in the United States.  See  § 1677(7)(C)(i).

## II.  The ITC's Finding With Respect to Volume Is Supported By Substantial Evidence and Otherwise In Accordance With Law.

Plaintiff's contest to the ITC's finding is reviewed under the substantial evidence standard.  The Court will uphold a determination by the ITC only if it is supported by substantial evidence and otherwise in accordance with law.  See Nippon, 391 F. Supp. 2d at 1275.  The ITC's determination, however, is "presumed to be correct," and the burden of demonstrating otherwise rests upon the party challenging the determination.  28 U.S.C. § 2639(a)(1).  As such, the party challenging the ITC's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal."  Mitsubishi Heavy Indus., Ltd. v. United States, 275 F.3d 1056, 1060 (Fed. Cir. 2001).  Indeed, the United States Court of Appeals for the Federal Circuit ("CAFC") has indicated that "in the hierarchy of the four most common standards of review, substantial evidence is the second most deferential, and can be translated roughly to mean[:] is [the determination] unreasonable?"  See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal citation and quotations omitted) (alteration in original).

In the instant matter, Plaintiff challenges the sufficiency of

the ITC's determination on volume by contesting the ITC's subsidiary findings. Specifically, CFBI insists that the ITC made the following "erroneous findings," each of which it contends is unsupported by substantial evidence and otherwise contrary to law:

> (i) that China's transition to a net exporter of subject merchandise had no significant effect on the behavior of subject producers; (ii) that demand for structural steel beams in Asia was projected to be commensurate with the increase in supply in that region; (iii) that price disparities do not provide an incentive for subject producers to increase exports to the U.S. market; (iv) that the available information concerning the Canadian steel beams market was of "limited relevance" and that it did not indicate that subject imports would increase significantly in the United States should the orders be revoked; and (v) that subject producers have no incentive to significantly increase their presence in the U.S. market.

Pl.'s Mem. at 4. Each of Plaintiff's arguments will be addressed in turn.

In determining the existence of substantial evidence, a reviewing court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" Huaiyin, 322 F.3d at 1374 (quoting Atl. Sugar, 744 F.2d at 1562. Indeed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n., 383 U.S. 607, 619–20 (1966); see also Am. Silicon Techs.

v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001).  Based on the totality of the record before it, the Court may find that the ITC's ultimate conclusion is supported by substantial evidence, even where it determines that a subsidiary finding is unsupported by substantial evidence.  See United States Steel Group v. United States, 96 F.3d 1352, 1364-65 (Fed. Cir. 1996).

>     Moreover, that a challenging party seeking review
>
>> can point to evidence [on] the record which detracts from the evidence which supports the [International Trade] Commission's decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive. It is not the function of a court to decide that, were it the Commission, it would have made the same decision on the basis of the evidence.

See Matsushita Elec. Indus. Co., Ltd. v. United States, 750 F.2d 927, 936 (Fed. Cir. 1984).  For "[i]t is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record."  See Stalexport and Huta Czestochowa v. United States, 19 CIT 758, 763-64, 890 F. Supp. 1053, 1059 (1995).  Accordingly, the question for the reviewing Court is "not whether we agree with the Commission's decision, nor whether we would have reached the same result as the Commission had the matter come before us for decision in the first instance." U.S. Steel, 96 F.3d at 1357.  Instead, this Court "must affirm a Commission determination if it is reasonable and supported by the

record as a whole, even if some evidence detracts from the Commission's conclusion." See Altx, Inc. v. United States, 370 F.3d 1108, 1121 (Fed. Cir. 2004) (internal quotations omitted). In short, the Court does "not make the determination; [it] merely vet[s] the determination." See Nippon, 458 F.3d at 1352.

For the reasons that follow, the Court finds that the ITC's determination with respect to likely volume is both supported by substantial evidence and otherwise in accordance with law. In each of the arguments posed by Plaintiff, Plaintiff attacks the substantiality of the evidence supporting the ITC's findings by proffering its own evidence supporting the opposite conclusion. It claims that the record in its entirety does not support the ITC's final determination because of what it considers to be "overwhelming" evidence to the contrary. See Pl.'s Br. at 8. This, Plaintiff insists renders the ITC's finding unreasonable. The Court disagrees. As will be demonstrated infra, with respect to each contested finding, the ITC reached a reasonable conclusion, supported by substantial evidence.

### A.   Developments in Asian Markets and Likely Volume

Plaintiff contests the ITC's finding regarding whether recent and projected developments in Asian markets would have a significant effect on exports to the United States should the orders be revoked. See generally Pl.'s Br. at 9–21. Specifically,

CFBI sets forth a series of arguments regarding conditions of competition in the People's Republic of China ("China") and its relation to exports from Korea and Japan. Id. Although the ITC's sunset reviews did not directly implicate China or Chinese producers, there was no dispute that conditions in the Chinese market were relevant to the ITC analysis. See Def.'s Resp. at 13 ("China was both a significant consumer and . . . producer of structural products and the large Chinese market was reasonably proximate to the subject producers in Japan and Korea.").

   a.   **The ITC's Determination that China's Transition to a Net Exporter Has Not Had a Significant Effect is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

Plaintiff insists that the ITC "erred in concluding that China's transition to a net exporter of the subject merchandise had no significant effect on the behavior of subject producers." Pl.'s Mem. at 9. Although it acknowledges that Defendant "examined whether developments in Asian markets would provide subject producers the motivation to significantly increase exports to the United States," Plaintiff argues that in reaching its conclusions, the ITC "failed to consider the record in its entirety and failed to adequately account for . . . evidence opposed to its views." Id. at 9-10. CFBI contends that due to China's shift to net exporter, Chinese producers have displaced Japanese and Korean producers from China and other markets in Asia. See id. In other words, Plaintiff maintains that exports of competitively-priced Chinese

merchandise are capturing a market share that once belonged to the Japanese and Korean producers. See Pl.'s Reply Br. Supp. R. 56.2 Mot. J. Ag. Rec. at 6 ("Pl.'s Reply"). As a result, Plaintiff insists, upon revocation of the orders, Japanese and Korean producers will be forced to increase exports to alternative markets, including the United States. See Pl.'s Mem. at 9–10. Further, CFBI points to record evidence it contends contradicts the ITC's finding on the effect of China's transition to net exporter.[10] See id. 9–13.

This Court will affirm an ITC determination if it is reasonable and supported by the record as whole, even if some of the record evidence detracts from the ITC's finding. See Altx, 370 F.3d at 1121. Here, the Court finds that the ITC did support its determination with respect to the effect of China's transition to net exporter. It both explained its findings and supported them with substantial record evidence. See Int'l Imaging Materials, Inc. v. United States, 30 CIT __, __, Slip Op. 06-11 at 13 (Jan. 23, 2006) (not published in the Federal Supplement)(indicating that

_____

[10]     Plaintiff devotes several pages of its brief identifying data for limited Asian markets, such as Singapore; data representing limited periods of time; and press information. See Pl.'s Mem. at 11 ("China has increased imports to Singapore - by 167 percent in 2004 and by 13 percent in . . . 2005 . . . Korean exports to Singapore have dropped significantly."); id. at 12 (citing China's Growing Strength in Steel Trade Worries Neighbors, Steel Week, Vol. 11, No. 31, Oct. 14, 2005, C.R. Doc. 116 at Exh. 13A) ("Industry experts confirm the substantial impact of growing Chinese beam exports on subject producers.").

an agency must set forth its reason for decision).

As acknowledged by Plaintiff, the ITC examined whether China's transition to a net exporter had an effect on the behavior of the subject merchandise producers in Japan and Korea. Upon considering the record evidence before it, the ITC rejected CFBI's argument that China's transition significantly "displaced" the subject producers from Asian markets. See Final Determination, C.R. Doc. 159 at 20 ("We have . . . examined whether recent and likely developments in Asian markets would provide subject producers the motivation to increase exports to the United States to significant levels should the orders be revoked. We have particularly focused on the transition in China . . . from a 'net importer' to a 'net exporter' of beams."). Instead, it found that "[t]he record does not indicate that the transition in China has caused any significant change to the behavior of the subject producers." Id.; see also Def. Intevenor's Br. Opp'n Pl.'s R. 56.2 Mot. J. Ag. Rec. at 16 ("Def. Int.'s Br.").

In accordance with the substantial evidence standard, the ITC set forth its rationale for its conclusion. First, the ITC explained that based upon the totality of the record evidence, it concluded that China's status as net exporter would not be likely to "cause any significant change to the Japanese producers' behavior in the reasonably foreseeable future." Final

Determination, C.R. Doc. 159 at 21.  It based this conclusion,

primarily, on two findings: (1) that Japanese exports to Asia

peaked and were significantly declining prior to the Chinese

transition; and (2) Japanese producers are focused on their home

markets, and export markets, therefore, are of limited importance.

See id. at 20 (citing Structural Steel Beams From Japan and Korea,

Staff Report to the ITC (Feb. 7, 2006), C.R. Doc. 145, Table IV-6);

see also Def.'s Resp. at 14.  In its final determination, the ITC

pointed to record evidence to support its conclusion and explained

that:

> [D]uring the period of review, Japanese
> producers were overwhelmingly focused on their
> home market; at least [[a very significant]]
> percent of reported shipments were directed to
> the home markets during each calendar year or
> interim period . . . . [T]he only calendar
> year in which Japanese producers' home market
> shipments were less than [[a substantial]]
> percent of their total shipments was 1998,
> when home market demand had plummeted due to
> the Asian financial crisis.  We observe that
> Japanese producers' reported exports to Asia
> peaked . . . well before the Chinese
> transition.  The Japanese producers did not
> attempt to recoup declining Asian export
> shipments . . . they simply operated at lower
> capacity utilization levels.  Consequently,
> the record does not indicate that the Chinese
> transition has resulted in any changes to
> Japanese producers' likely behavior.  Instead,
> it indicates that the overwhelming focus of
> these producers is on their home market and on
> other Asian markets.

Final Determination, C.R. Doc. 159 at 20 (internal citation

omitted).

Having reached, and supported its conclusion with respect to Japan, the ITC then examined the potential effects of China's transition on Korean producers.[11]  See id. at 21.  It determined that the Chinese transition did not impair Korean producers' ability to export merchandise.  On the contrary, it found that Korean producers' exports to Asian markets reached a peak in 2004.  Moreover, the ITC found that although the producers' exports to Asian markets were lower in interim 2005 than in interim 2004, Korean aggregate exports were higher to all markets in interim 2005 than in interim 2004.  See id. (citing C.R. Doc. 145, Table IV-7).  "Consequently, the data on the record indicate that the Chinese transition has not reduced Korean producers' ability to export subject merchandise."  Id.

The ITC further determined that the Chinese transition also

---

[11]     The ITC further explained that the record indicates that the transition in China is not likely to cause any significant change in supply or demand in either China or to Asia in the reasonably foreseeable future.  Final Determination, C.R. Doc. 159 at 21.  It offered the following explanation in support of its conclusion:

> During the period of review, Chinese production increased more rapidly than Chinese consumption.  China shifted from being a net importer of structural long products to being a next [sic] exporter during the third quarter of 2004.  The surplus of production over consumption is expected to decline in 2006 and increase [minimally] from the 2006 level in 2007.

Id.

did not significantly impair Korean producers' ability to supply their home market.  See id.; see also Def.'s Resp. at 15.  In interim 2005, Korean producers' home market share was substantial, and only minimally lower than the peak market share previously held by the Korean producers.  See Final Determination, C.R. 159 at 21 (citing Korean Producers Posthearing Brief at Q-2).  Although slightly lower than the Korean producers' peak, Korean producers' interim 2005 market share was, nonetheless, greater than the market share the Korean producers reached during two of the three preceding calendar years.  See id.; Def.'s Resp. at 15 (citing C.R. Doc. 126 at Q-2).  Thus, the ITC reasonably concluded that "the Chinese transition to net exporter status does not appear to have significantly dislocated the Korean producers, who displayed very high capacity utilization during the latter portion of the period of review, from either their home market, their Asian export markets, or their export markets generally."  Final Determination, C.R. Doc. 159 at 21; see also Def.'s Resp. at 15 ("In light of this data, the Commission reasonably concluded that China's becoming a net exporter of structural steel products in 2004 did not have a significant impact on the home market or export sales patterns of the subject producers in 2005.").  Accordingly the ITC found that China's net export status will not "likely cause any significant change to the Korean producers' behavior in the reasonably foreseeable future."  Final Determination, C.R. Doc. 159 at 21.

The Court finds that the ITC supported each of its conclusions with substantial record evidence. That Plaintiff points to evidence it considers to detract from the ITC's determination, does not, in this instance, warrant remand. Indeed, "[s]o long as there is adequate basis in support of the Commission's choice of evidentiary weight, [this Court] reviewing under the substantial evidence standard, must defer to the Commission." Nippon, 458 F.3d at 1359. The Court, therefore, affirms the ITC's conclusion with respect to the effect of China's transition to a net exporter of structural steel beams.

**b. The ITC's Determination Regarding Supply and Demand in the Subject Countries and China is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

Plaintiff maintains that the "record flatly contradicts the [ITC's] findings" with respect to both supply and demand. Pl.'s Br. at 15. Contrary to the ITC's findings, Plaintiff argues that there is substantial record evidence indicating that demand for steel beams in Asia is slowing. See id. It relies primarily upon the service data, which it contends demonstrates that growth in Asian consumption is projected to decline slightly in 2005, with a further decline expected during the end of 2006 and 2007. See id. (citing Pet.'s Posthearing Br., C.R. Doc. No. 125, Exh. 16A.). CFBI claims that Japan has experienced a decline in consumption, with negligible increases projected for 2006 and 2007, followed by

declines in 2008 and 2009. See id. at 15-16. It continues that "[g]rowth projections in Korea are similarly constrained." Id. at 16 ("The Korea Iron and Steel Association . . . reports that apparent consumption for section products declined by 7.1 percent from fiscal year (ending March 31) 2003 to 2005."). Plaintiff finally maintains that "[a]dditional data placed on the record by Petitioner show that demand for steel beams in both Japan and Korea is projected to slow, if not decline." Id. (citing Pet.'s Prehearing Br., C.R. Doc. 116 at 34-37; Pet.'s Posthearing Br., C.R. Doc. 125 at 5-6). It insists that both this, and the service data refute the ITC's findings with respect to demand, but "received virtually no consideration or analysis" by the ITC. Id.

As a result of this decreased consumption, Plaintiff maintains that Asian production exceeds demand, and thereby results in an oversupply of steel beams in the region. See id. It claims that the service data projects a continued gap between production and consumption in Asia though 2010. See id. at 17. Due to the gap between production and consumption, CFBI further contends that China is experiencing oversupply. See id. at 18. In addition, it claims that the record contains "other expert forecasts projecting a global oversupply of beams, stemming in large part from the growing gap between production and consumption in Asia." Id. at 19. This evidence of oversupply, Plaintiff claims, contradicts the ITC's findings regarding supply and demand for steel beams in Asia

in the reasonably foreseeable future. See id. at 20. CFBI maintains that there is no indication that the ITC considered the evidence it claims detracts from the ITC's findings. See id. at 20-21 ("The Commission, therefore, failed to take into account the body of evidence opposed to [its] views, failed to consider the entirety of the record, and failed to base its findings on substantial evidence as required by law.") (internal citation and quotations omitted).

In the instant inquiry, the Court finds that the ITC comprehensively examined whether conditions of competition in Asian markets would likely change significantly in the reasonably foreseeable future. See Final Determination, C.R. Doc. 159 at 19. It did so not only by considering the evidence supporting its conclusion, but all of the evidence placed upon the record. Based upon the record evidence, it then concluded that there was not likely to be a significant change in the supply of, or demand for structural steel beams in China, or East and Southeast Asia in the reasonably foreseeable future. See id. That Plaintiff may point to record evidence it contends contradicts the ITC's finding does not alone warrant remand. It is well-established that a Commission "determination will not be 'overturned merely because the plaintiff is able to produce evidence . . . in support of its own contentions and in opposition to the evidence supporting the agency's determination.'" Timken Co. v. United States, 27 CIT __,__, 264 F.

Supp. 2d 1264, 1268–69 (2003) (quoting Torrington Co. v. United States, 14 CIT 507, 514, 745 F. Supp. 718, 723 (1990), aff'd, 938 F.2d 1276 (Fed. Cir. 1991) (internal quotations omitted). Indeed, it "is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." Stalexport, 19 CIT at 763–64, 890 F. Supp. at 1059. Finally, the Court finds that the ITC explained the rationale for its conclusion in a manner which allowed this Court to review its line of analysis, reasonable assumptions and other considerations. See Int'l Imaging Materials, 30 CIT at __, Slip Op. 06-11 at 13 ("[An] agency must explain its rationale . . . such that a court may follow and review its line of analysis, its reasonable assumptions, and other relevant considerations."). For these reasons, and those that follow, the Court affirms the ITC's determination regarding conditions of competition in the subject countries and China.

As an initial matter, the ITC explained that the type of subject import surge that occurred during the original investigations would not be likely to recur upon revocation of the orders. See Final Determination, C.R. Doc. 159 at 19–20; see also Def. Int.'s Br. at 10. This surge was primarily due to: (1) the 1997–1998 Asian financial crisis,[12] which resulted in depressed

---

[12] The Asian financial crisis was a period of "extreme difficulties in the financial and construction sectors of Pacific Rim countries including Japan and Korea, which depressed steel

demand for structural steel beams throughout Asia; and (2) a shortage in the supply of domestically produced beams. See Certain Structural Steel Beams from Japan, Inv. No. 731-TA-853 (Final), USITC Pub. 3308 at 10–11 (June 2000);    see also Final Determination, C.R. Doc. 159 at 19. The ITC noted that "[n]either of these particular conditions of competition is present now or is likely to be present in the reasonably foreseeable future." Id. at 19.

The ITC then examined current and projected conditions of competition and found that consumption of structural long products increased during the period of review, and was projected to further increase in 2006 and 2007. Id. at 15–16 (citing CFBI Prehearing Br., ex. 6A, Table 5S); see also Def. Int.'s Br. at 16 ("[CFBI] does not and cannot maintain that demand is declining because the [service] data that it submitted to the Commission unequivocally shows [a different conclusion]."). Specifically, it found that since the Asian financial crisis, there "are no current or anticipated declines in Asian demand;" that "demand has increased;" and, is projected to "grow further in these areas in the foreseeable future." Final Determination, C.R. Doc. 159 at 19. In

---

beam demand in those countries. Indeed, in East and Southeast Asia, including China, consumption of structural long products declined . . . from 1997 to 1998." Final Determination, C.R. Doc. 159 at 15.

support of this, the ITC cites to various service data tables and reports, the original ITC determination, and CFBI's Prehearing Brief. See C.R. Doc. 159 at 15-16 n.97-n.102.

Second, the ITC addressed CFBI's contentions regarding oversupply. It determined that although global production of structural long products declined from 2000 to 2001, it increased in 2005, and is projected to further do so in 2006 and 2007. See id. at 16 (citing C.R./P.R. Table IV-9; IV-10). It examined supply trends and the potential surplus of production over consumption. The ITC acknowledged the likely surplus, but explained that:

> During the period of review, in East and Southeast Asia generally (including China), production of structural long products exceeded consumption. The surplus of production over consumption was at its [[peak]] in 2000, declined each year until 2003, and increased thereafter. This surplus is forecast to decline in 2006 and then increase [[relatively minimally]] in 2007 . . . [Moreover,] [t]he surplus of production over consumption in China is expected to decline in 2006 and increase only [[minimally]] from the 2006 level in 2007.

Final Determination, C.R. Doc. 159 at 16 (citing service data submitted by CFBI). Thus, the ITC pointed to record evidence supporting its finding that the surplus of production over consumption in East and Southeast Asia would decline in 2006, increase minimally in 2007, and that the surplus of production over consumption in China would decline in 2006 and increase minimally from the 2006 level in 2007. See id. at 16, 21 (citing CFBI

Posthearing Br., Exh. 16A, Tables S5, S12.).  Based upon these projections, and the entirety of the record evidence, the ITC reasonably found that the relationship between supply and demand in Asian markets was unlikely to change significantly in the reasonably foreseeable future, and, thus, concluded that supply and demand conditions in those markets would not likely cause any significant change to the subject producers' behavior.  See id. at 21.  ("Because we do not perceive any major changes in conditions of competition in these markets to be likely in light of projected supply and demand trends, we do not perceive that conditions in Asia will likely cause any significant change to the subject producers' behavior in the reasonably foreseeable future.").

> **c.    The ITC's Finding that Price Differentials Would Not Likely Affect Exporter Behavior is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

In its final determination, the ITC concluded that price differentials would not likely affect exporter behavior.  See Final Determination, C.R. Doc. 159 at 22.  Plaintiff argues that this conclusion "defies logic and is not supported by substantial evidence."  Pl.'s Br. at 21.  In support of this, Plaintiff points to evidence of instances where "Korean producers have sought more attractively priced markets. . . ."  Id. at 22.  It also contends that the ITC "failed to consider record evidence demonstrating that the current price gap between the U.S. and world markets is a

relatively new phenomenon." Id. at 23. Related to this point, it further argues that the ITC additionally "failed to consider the most recent pricing data of record, showing [a] growing price gap between the U.S. and world markets." Id. at 24. Overall, Plaintiff maintains that "the record contains substantial evidence of a significant and growing price gap that provides more than sufficient incentive for subject producers to export large volumes of steel beams to the U.S. market." Id. at 25.

In reaching its determination, the ITC examined whether price differentials between the United States domestic market and other markets were likely to lead to an increase in subject import volume if the orders were revoked. See Final Determination, C.R. Doc. 159 at 22; Pl.'s Br. at 21; Def.'s Resp. at 23. In so doing, the ITC examined past export trends. It found that the record data indicated that there was a large disparity between prices in the United States and those in China and other markets from 2000 through the first half of 2002. See Final Determination, C.R. Doc. 159 at 22 (citing C.R./P.R. Table I-8). Despite this, and contrary to Plaintiff's theory, it observed that total import penetration into the United States decreased sharply after 2000. Id. (citing C.R./P.R. Table I-1). Contra, Pl.'s Reply at 13 ("[T]he record shows a strong correlation between price disparities and exports . . . the gap between prices in the United States and Asia widened substantially . . . resulting in a surge of imports from [Asian

markets].”).   A similar lack of correlation between price differentials and import volume was also observed in 2005, when the domestic price for medium sections and beams was higher than in several Asian markets.  See Final Determination, C.R. Doc. 159 at 22 (citing CFBI Posthearing Br., Exh. 16D at 23).  Prices for beams in 2005 were considerably higher in the United States than in China, and in several foreign markets.  This notwithstanding, the ITC concluded that the record indicates that no influx of imports into the United States from any source occurred during 2005, also the time when China was a net exporter.  See id.  On the contrary, the domestic industry's share of apparent U.S. consumption was 95.4 percent in interim 2005, only two-tenths of a percentage point below peak market penetration reached during the period of review.  See id.

Having found a lack of correlation between price disparities and increased imports into the United States, the ITC reasonably concluded that the record evidence “does not support the contention advanced by [CFBI] that price differences between U.S. and Asian markets are likely to provide an incentive for the subject producers to increase exports to the United States at such a rate as to cause the domestic industry to lose significant market share if the orders are revoked.”  Id. at 23.  The Court finds that this conclusion is both supported by substantial record evidence and otherwise in accordance with law.  As discussed supra, it is not

the province of the Court to reweigh the evidence before the agency. See Nippon Steel Corp., 458 F.3d at 1359. The Federal Circuit has made clear that "when the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder - here the majority of the Presidentially-appointed, Senate-approved Commissioners - to decide which side's evidence to believe. So long as there is adequate basis in support of the [ITC's] choice of evidentiary weight, [this Court,] reviewing under the substantial evidence standard, must defer to the [ITC]." Id. Here, that there was evidence both supporting and detracting from the ITC's finding illustrates that the answer to the instant inquiry was not, as it rarely is, black-and-white. Accordingly, it is the role of the ITC to weigh the evidence, and support its conclusion with substantial evidence. See id. at 1358 ("[T]he resolution of these questions [relating to 'the proper weight of evidence'] must be left to the expert factfinder."). The Court finds that the ITC reasonably determined that the record evidence does not support the claim that price differences between U.S. and Asian markets are likely to provide an incentive for the subject producers to increase exports to the United States upon revocation of the orders.

The Court also addresses an ancillary argument posed by Plaintiff. Plaintiff mischaracterizes the ITC's position regarding whether price disparities between the United States and other

markets provide incentive to increase exports into the United States upon the revocation of the orders. See Def. Int.'s Br. at 19–20. In its brief, CFBI cites to a finding reached by the ITC in the original investigation. See Pl.'s Br. at 22 (citing Determination and Views of the Commission, Certain Structural Beams from Japan, Inv. No. 731-TA-853 (Final) USITC Pub. 3308, P.R. Doc. No. 18 at 18 (June 2000)) ("[T]he Commission itself recognized in the original investigation that attractively-priced markets create a major incentive for subject producers."). In the original investigation the ITC stated that "subject producers have a great incentive to ship significant quantities of subject merchandise to the United States. Prices in the U.S. market have recently recovered to 1997 levels. This makes the United States . . . an attractive market for the subject imports." Id. at 23. Plaintiff points to this, and argues that despite this finding the ITC "now baldly asserts that price disparities have no influence on export patterns and create no incentive for subject producers." Id. It further contends that the ITC erred in offering "no reasonable explanation for why subject producers would not be immediately attracted to the highest priced markets should the orders be revoked." Id. Plaintiff's argument fails for two reasons.

First, it is well established that "'each injury investigation is sui generis, involving a unique combination and interaction of many economic variables; and consequently, a particular

circumstance in a prior investigation cannot be regarded by the [ITC] as dispositive of the determination in a later investigation.'" U.S. Steel Group v. United States, 18 CIT 1190, 1213, 873 F. Supp. 673, 695 (1994) (quoting Connecticut Steel Corp. v. United States, 18 CIT 313, 318, 852 F. Supp. 1061, 1066 (1994)). Here, the ITC was presented with different facts and economic conditions than were presented in the prior determination. As indicated, prior determinations do not bind the ITC in the determination currently at issue. See id. Further, although the Court believes that it was adequately explained, the Court finds that the ITC was not obligated to explain why the subject producers would not shift their imports toward attractively-priced markets should the orders be revoked. See id. ("[T]he court finds that the [ITC] was not obligated to explain in any particular manner the change in its views on [its findings] from prior determinations, as its analysis was clearly based on a different set of facts."); see also Allied-Signal Aerospace Co. v. United States, 28 F.3d 1188, 1191 (Fed. Cir. 1994). Plaintiff argues that the ITC offered "no reasonable explanation for why subject producers would not be immediately attracted to the highest priced market" upon revocation. Pl.'s Br. at 23. Plaintiff's argument misses the point. The ITC need not hypothesize about why an economic actor may behave in a certain manner. Instead, the ITC is charged with reviewing the record evidence and reaching a conclusion which is

both reasonable and supported by substantial evidence.  In the instant matter, the ITC fulfilled its duty and both pointed to record evidence in support of its conclusion, and explained why its conclusion is valid.  See Sichuan Changhong Electric Co., Ltd., v. United States, 30 CIT __, __, 460 F. Supp. 2d 1338, 1348 (2006).  Indeed, the ITC weighed the record evidence, found and explained a lack of correlation between price differentials and domestic import volume, and reached a reasonable conclusion.  As such, for the reasons set forth above, the Court affirms the ITC's finding on the potential effect of price differentials.

**B.    Relevance and Use of Canadian Import Data**

   **a.    The ITC's Finding Regarding the Limited Relevance of Canadian Data is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

To further bolster its position, CFBI relies upon record evidence concerning the Canadian beams market.[13]  It claims that Canada is the "most accurate test case for what will happen in the United States should the orders be revoked."  Pl.'s Br. at 29.  The

---

   [13]    According to Plaintiff's Brief, both "parties acknowledged . . . that due to Canada's proximity and similar demand structure, its beams market closely resembles that of the United States (other than in sheer size)."  Pl.'s Br. at 25–26 (citing Pet.'s Posthearing Br., C.R. Doc. 125 at 10; Resp't Prehearing Br., C.R. Doc. 119 at 6).  Accordingly, both Petitioner and Respondent placed upon the record information concerning the Canadian beams market.  See Pl.'s Br. at 26.  In addition, the relevance of said information was discussed during the hearing before the ITC.  Id. (citing Hearing Trans., P.R. Doc. No. 102 at 98-100).

ITC, however, concluded that the Canadian import information introduced by the parties is of limited relevance. See Final Determination, C.R. Doc. 159 at 22. Plaintiff maintains that this finding is not supported by substantial evidence. See Pl.'s Br. at 26 (arguing that the ITC's conclusion is "difficult to comprehend" and its "explanation for how it reached its conclusion is wholly inadequate."). It further contends that, to the extent that the ITC did consider the Canadian import data, it relied upon incomplete data and disregarded the most recent information available. See id. at 27. It claims that the ITC should have relied upon "the most recent publicly available data" for November 2005 to January 2006, including Canadian licensing data for the first 21 days of January. Id. at 28. CFBI insists that the comprehensive record evidence demonstrates that Korean producers are "employing aggressive pricing tactics to gain market share in Canada at the expense of U.S. producers." Id. at 29. The Court finds CFBI's arguments to be unconvincing.

Plaintiff's claim regarding the relevance of the Canadian import data lacks merit. The ITC is not obligated to collect or consider data on conditions of competition in the Canadian market. See 19 U.S.C. § 1675a(a)(2). As reflected in its final determination, the analysis in a sunset review focuses on likely conditions in the United States market. See Final Determination, C.R. Doc. 159 at 22 n.153. The statute does not require that the

ITC ascertain the actual or likely significance of import volume in markets other than in the United States. See 19 U.S.C. § 1675a(a)(2); Def.'s Resp. at 32 n.18. Instead, § 1675a(a)(2) directs the ITC to "consider whether the likely volume of imports of the subject merchandise would be significant if the order is revoked or the suspended investigation is terminated, either in absolute terms or relative to production or consumption in the United States." 19 U.S.C. § 1675a(a)(2) (emphasis added).

The ITC explained that "[e]valuation of conditions in a foreign market, such as Canada, can only be pertinent to the statutory inquiry if conditions of competition in that market resemble conditions of competition in the United States." Final Determination, C.R. Doc. 159 at 23 n.153. It continued that, although CFBI, in its submissions, "appears to assume that Canadian conditions of competition closely parallel those in the United States, it did not submit any information that would permit [the ITC] to evaluate this assumption."[14] Id. Moreover, there was

---

[14] Although substantially a post hoc rationalization, in its response, Defendant, set forth the following:

> The available information about conditions of competition in Canada . . . was limited and did not indicate that Canadian conditions of competition mirrored those in the United States. For example, there was no detailed pricing data in the record for Canada of the type collected for structural steel beams sold in the United States during the period of review. Similarly, there was no

information on the record "suggesting that there may be conditions of competition relating to demand in Canada that are unique to that country." Id. (citing Hearing Tr. at 262 (Lee)). For example, the ITC indicated that there had been no producer of structural steel beams in Canada during the period of review. As a result, the Canadian market has been entirely dependent on imports.

The CAFC has emphasized that it is "the [ITC's] task to evaluate the evidence it collects during its investigation," and "[c]ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." United States Steel Group, 96 F.3d at 1357. In the instant matter, the ITC complied with its statutorily defined inquiry and examined evidence relevant to the United States market. In addition, it evaluated, but placed less weight on the proffered Canadian import information, and explained its decision to do so. See Final Determination at 17, 22-23. The ITC was well within its discretion in discounting the probative value of the Canadian import data. Indeed, during an investigation, the ITC "collects

> information in the record indicating whether Canadian purchasers were similar to U.S. purchasers in preferring to purchase U.S.-produced beams for non-price reasons. Furthermore, the available data indicated that trends in apparent consumption of structural steel beams were appreciably more volatile in Canada than in the United States.

Def.'s Resp. at 31 (internal citation omitted).

extensive economic data from which it develops a thorough understanding of extremely intricate economic interactions.  This thorough understanding permits the [ITC] to evaluate each piece of evidence in context and to reach well-supported determinations which take account of as many aspects of a complicated economic reality as possible."  United States Steel Group, 96 F.3d at 1358.

Notwithstanding the paucity of the Canadian import information submitted to it, the ITC nonetheless evaluated whether the data supported CFBI's contention regarding the correlation between the Canadian market and the result of revocation of the orders.[15]  See Final Determination, C.R. Doc. 159 at 23.  The ITC determined that

---

[15]     The ITC made the following findings regarding the Canadian import information:

> This information indicates that neither the
> 2004 transition of China from a net importer
> to a net exporter of structural long products
> nor any purported price disparities between
> North American markets and those in Asia have
> affected U.S. producers' status as the
> dominant supplier of structural steel beams
> to Canada, which has no domestic structural
> steel beams industry.  Although Korean
> exports to Canada increased on both an
> absolute and relative basis in 2004, U.S.
> exporters increased their market share that
> year by eight percentage points.  In 2005,
> despite increased Korean exports during the
> latter portion of the year, U.S. market
> penetration was higher, and Korean market
> penetration was lower, than in 2004.

Final Determination, C.R. Doc. 159 at 22-23 (internal citation omitted).  Contra, Pl.'s Br. at 28-29.

"the available information concerning Canada does not support the contention advanced by [CFBI] that price differences between the U.S. and Asian markets are likely to provide an incentive for the subject producers to increase exports to the United States." Id.

Given the relative dearth of evidence supporting CFBI's claim, and the evidence to the contrary, there is no reason why the ITC is obligated to consider CFBI's conjecture without the benefit of record evidence. See Comm. for Fairly Traded Venezuelan Cement v. United States, 27 CIT __, __, 279 F. Supp. 2d 1314, 1337–38 (2003). Indeed, Plaintiff's insistence that Canada is the "best indicator" of how subject producers would react absent unfair trade orders is based on incomplete evidence and lacking evidentiary support. Despite certain superficial similarities, the available record evidence does not provide an adequate basis to treat Canada, in essence, as a surrogate. The ITC must base its assessment on "currently available evidence and on logical assumptions and extrapolations flowing from that evidence." Matsushita, 750 F.2d at 933. In the instant matter, CFBI has not pointed to sufficient record evidence indicating that conditions of competition in Canada resemble conditions of competition in the United States. As such, the ITC was within its discretion to afford limited relevance to the information at issue. See e.g., Comm. for Fairly Traded Venezuelan Cement, 27 CIT at __, 279 F. Supp. 2d at 1337 n.39 (sustaining the ITC's determination where it "looks at all the

evidence that's before it.  It just found that because [the evidence] was mixed, it wasn't compelling . . . .").  It should be noted, however, that the Court does not rule on the relevance of the Canadian import data but simply finds that, for the aforementioned reasons, the ITC was within its discretion to afford limited weight to the data.

In addition to questioning the ITC's finding on relevance, Plaintiff insists that the ITC erred in "not adequately assessing the most recent information available," as contained in the Korean Producers' Posthearing Brief.  Pl.'s Br. at 27; see also Def.-Int. Resp. at 25 ("[CFBI] also objects to the Commission's use of import statistics for the entire review period.").  Plaintiff argues that although the Commission noted that it considered the most recent data for November 2005 to January 2006, it "dismissed such data out-of-hand, asserting that data for such a short time period was not a meaningful indicator of longer-term trends."  Pl.s' Br. at 28.

The Court finds that ITC was within its discretion to select which data to rely upon.  It is well established that "because the statute does not expressly command the Commission to examine a particular period of time . . . the Commission has discretion to examine a period that most reasonably allows it to determine whether a domestic industry is injured . . . ."  Nucor Corp. v.

United States, 414 F.3d 1331, 1337 (Fed. Cir. 2005) (internal citation and quotations omitted); see also Kenda Rubber Indus. Co. v. United States, 10 CIT 120, 126-27, 630 F. Supp. 354, 359 (1986). In other words, as long as its decision is explained, the ITC may rely on the data it considers to be the most reliable. Here, the ITC found that it was appropriate to base its decision on data for the entire period of 2005. It explained that due to monthly fluctuations in Canadian imports from Korea, it found the less comprehensive data to be unreliable and, thus, examined data for the complete calendar year.[16] See Final Determination, C.R. Doc. 159 at 23. Furthermore, contrary to CFBI's assertions, the ITC expressly indicated that it considered all data through January 21, 2006, submitted by Plaintiff. It noted, however, that although it considered such data, it did "not find partial data for a single month to be a meaningful indicator of longer-term trends." Id. at 23 n.155. The ITC, was therefore, rightly within its "broad discretion in choosing the time frame for its investigation and analysis . . . ." Nitrogen Solutions Fair Trade Comm. v. United

---

[16] The Court also notes that in its final determination, the ITC explained that it disregarded the Canadian import data for December 2005 that the Korean producers had attempted to submit, because the submission of the proffered information was not consistent with 19 C.F.R. § 207.68(b) (2000). See Final Determination, C.R. Doc. 159 at 1 n.2 ("We have determined that the Korean Producers' Final Comments contain new factual information . . . . Accordingly . . . we have disregarded [certain enumerated sentences] and percentage change figures . . . .").

States, 29 CIT __, __, 358 F. Supp. 2d 1314, 1325 (2005).

Therefore, for the foregoing reasons, the Court finds that the ITC acted reasonably in exercising its discretion by: (1) affording limited relevance to the Canadian import data; and (2) focusing its examination of this data for the calendar year 2005, rather than for the period advocated by CFBI.  Accordingly, the Court affirms the ITC's finding with respect to the Canadian import data.

**C.    The ITC's Determination that Likely Subject Import Volume Would Not Be Significant Upon Revocation of the Orders is Supported by Substantial Record Evidence and Otherwise in Accordance With Law.**

Based on the foregoing, the Court finds that the ITC supported its determination that the volume of cumulated subject imports from Japan and Korea would not likely be significant if the orders under review were revoked.  In the final determination, the ITC both reasonably explained, and pointed to substantial record evidence supporting both its subsidiary conclusions and its ultimate finding regarding likely volume.  The final determination also addressed Plaintiff's claims and reflected that the ITC considered the record evidence contrary to its findings.  Accordingly the Court affirms the ITC's finding on likely volume, and rejects Plaintiff's claims to the contrary.  See Altx, Inc., 370 F.3d at 1121 (This Court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion.") (internal citation and

quotations omitted).

## III. The ITC's Findings On Likely Price Effects and Likely Impact Are Supported by Substantial Evidence And Otherwise in Accordance With Law.

In its final determination, the ITC determined that the cumulated subject imports were neither likely to have significant price effects nor likely to have a significant impact on the domestic industry.  See Final Determination, C.R. Doc. 159 at 24-29.  Plaintiff challenges the ITC's conclusions with respect to likely price effects and likely impact on the domestic industry only insofar as they incorporate the ITC's findings that likely volume effects of the subject imports would not be significant. See Pl.'s Br. at 32-34 ("[T]he [ITC's] findings regarding the likely volume of subject imports . . . are unsupported by substantial evidence and otherwise contrary to law.  For this reason alone, the Commission's conclusions regarding price effect are also unsupported by substantial evidence and otherwise contrary to law.").  CFBI does not assert any independent challenge to either the likely price effects or impact.  See id.; see also Def.'s Resp. at 33.  As discussed supra, this Court affirms the ITC's determination that the likely volume of cumulated subject imports would not be significant upon revocation of the orders. Accordingly, because CFBI premises its claim regarding likely price effects and impact on the ITC's volume finding, the Court affirms

the latter contested findings as well.

**CONCLUSION**

In accordance with the foregoing, the Court affirms the ITC's final determination.  Plaintiff's motion for judgment upon the agency record is denied, and this action is dismissed.


                                    /s/ Nicholas Tsoucalas
                                    **NICHOLAS TSOUCALAS**
                                    **SENIOR JUDGE**


Dated:     March 8, 2007
           New York, NY

**Slip Op. 07-33**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                        :
COMMITTEE FOR FAIR BEAM IMPORTS,        :
                                        :
            Plaintiff,                  :
                                        :
            v.                          :
                                        :   Court No.
UNITED STATES,                          :   06-00125
                                        :
            Defendant,                  :
                                        :
            and                         :
                                        :
HYUNDAI STEEL COMPANY,                  :
                                        :
            Defendant-Intervenor.       :
_____:

**JUDGMENT**

Upon consideration of Plaintiff, Committee for Fair Beam Imports' motion for judgment upon the agency record, the responses thereto, all other papers filed herein, and oral arguments presented, it is hereby:

**ORDERED** that the Plaintiff's motion for judgment upon the agency record is denied;

**ORDERED** that the United States International Trade Commission's final determination is affirmed; and it is further

**ORDERED** that this action is dismissed.


                                /s/ Nicholas Tsoucalas
                                **NICHOLAS TSOUCALAS**
                                **SENIOR JUDGE**

Dated:    March 8, 2007
          New York, NY